447 S.E.2d 259

**WEST VIRGINIA UNIVERSITY/WEST VIRGINIA BOARD OF REGENTS, Respondent Below, Appellant,**

v.

**Robert L. DECKER and the West Virginia Human Rights Commission, Complainants Below, Appellees.**

**No. 22100.**

Supreme Court of Appeals of West Virginia.

Submitted May 11, 1994.

Decided July 8, 1994.

Darrell V. McGraw, Jr., Atty. Gen., Kelli D. Talbott, Asst. Atty. Gen., Charleston, for appellant.

Darrell V. McGraw, Jr., Atty. Gen., Paul R. Sheridan, Sr. Asst. Atty. Gen., Charleston, for appellees.

NEELY, Justice:

The appeal in this age discrimination case concerns disparate impact under the West Virginia Human Rights Act, *W.Va.Code* 5–11–1 [1967] *et seq.* West Virginia University (the University) appeals the final order of the West Virginia Human Rights Commission (the Commission) pursuant to *W.Va.Code* 5–11–11 [1989] which found the University unlawfully discriminated against Robert L. Decker based on age with regard to salary. On appeal, the University alleges that its compensation policy is necessary to compete with other élite educational institutions and to preserve the University's reputation and accreditation.

The Commission viewed the University compensation system, which distinguishes between "new hires" and existing faculty, as having a disparate impact on older faculty members in violation of the West Virginia Human Rights Act, *W.Va.Code* 5–11–1 [1967] *et seq.* Upon finding that Dr. Decker proved a prima facie case of disparate impact, the Commission concluded that the University failed to show that the disputed practice is consistent with business necessity.

However, when we review the questions presented, this court disagrees and reverses the Commission. We hold that the University met its burden of proving business necessity, and Dr. Decker failed to present an equally effective alternative practice that would involve less adverse impact upon his protected class.

### I.

Robert L. Decker is a tenured professor at West Virginia University. He has a Ph.D. in industrial psychology from Carnegie Mellon University. Dr. Decker, a white male born in 1926, is a member of the protected class of persons under the West Virginia Human Rights Act.[1] *W.Va.Code* 5–11–1 [1967] *et seq.*

In 1955 Dr. Decker became a member of the faculty in the psychology department in the College of Arts and Sciences of West Virginia University. While teaching for the psychology department Dr. Decker was awarded tenure. In 1977, Dr. Decker accepted a position as associate professor in the industrial labor relations department of the University's College of Business and Economics. The College of Business and Economics at West Virginia University consists of six departments: accounting, economics, finance, industrial and labor relations, management, and marketing.

There are only two faculty members in the industrial and labor relations department, Dr. Decker and the Chairman, Randal Elkins. No new faculty have been hired in the industrial and labor relations department since it's formation in 1977. In 1979, Dr. Decker was promoted to full professor in the College of Business and Economics, industrial labor relations department of the University.

### II.

Institutions of higher education in West Virginia are dependent upon the legislature for the funding of employee salaries. Salary adjustments for existing faculty depend primarily on the availability of across-the-board salary increases initiated by the legislature or the University's board of trustees. Incumbent faculty members are also given salary increases when they are promoted to administrative positions, or change ranks. However, there is a separate and distinct process by which starting salaries for new faculty members are determined.

Starting salaries are based on the median "market" rate for similarly credentialed "new hires". The University is accredited by the American Assembly of Collegiate Schools of Business [hereinafter "AACSB"]. Each year the AACSB issues a questionnaire for a salary survey to the affiliated schools, and from information supplied in response, prepares a

---

1. *W.Va.Code* 5–11–3(k) [1994] defines "age" as     age forty or above.

document concerning average salaries. The information from this annual report serves as a guideline for the University regarding salaries for new faculty. The University uses the median salary range for the specific academic discipline to which five percent is added. This figure represents the starting salary offered to new hires.

Due to the University's poverty, compression and inversion of incumbent faculty salaries has resulted. Compression occurs when salaries offered to new hires increase more rapidly than the average salary increase for experienced, existing faculty. Inversion occurs when the salaries offered to new faculty, based on the competitive value in the academic marketplace, are higher than the salaries for existing faculty.

On 25 November 1987, Dr. Decker filed a complaint with the Commission alleging age discrimination with regard to the salary paid to him by the University. Dr. Decker claimed the University denied him an equitable raise in 1987, and that the University routinely hires young inexperienced faculty into the College of Business and Economics at salaries at or above his salary.[2] A hearing was held before the hearing examiner for the Commission.

On 21 April 1993, the hearing examiner held that the University's dual compensation policy did adversely affect faculty members over 40 years old already employed by the University, and violated the West Virginia Human Rights Act. However, the examiner found that Dr. Decker had not been personally affected because no new faculty had been hired in Dr. Decker's department since it was created in 1977. Thus, no new comparable faculty had been hired by the University at a higher salary than Dr. Decker's. For this reason, the hearing examiner ruled that Dr. Decker had suffered no compensable injury.

Both the University and Dr. Decker appealed the hearing examiner's decision to the Commission pursuant to *W.Va.* 77 C.S.R. 2–10 [1990]. The University appealed the finding that the compensation policy was discriminatory. Dr. Decker appealed the finding that he had suffered no injury as a result of the policy.

On 22 October 1993, the Commission entered a Final Order which upheld the finding of discrimination against the University, but reversed the finding that Dr. Decker had suffered no harm. As a result, Dr. Decker was awarded back pay with incidental damages for humiliation, embarrassment and loss of personal dignity, a cease and desist order, and reimbursement of expenses. This appeal followed.

### III.

The University's primary assignment of error is that Dr. Decker failed to establish a *prima facie* case of age discrimination under the West Virginia Human Rights Act, *W.Va. Code,* 5–11–1 [1967] *et seq.* Under *W.Va. Code,* 5–11–9 [1992], it is "an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, ... (1) [f]or any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions, or privileges of employment if the individual is able and competent to perform the services required even if such individual is blind or handicapped...."

"The term 'discriminate' or 'discrimination' means to exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, *age,* blindness, handicap, or familial status and includes to separate or segregate[.]" *W.Va.Code,* 5–11–3(h) [1994] (emphasis supplied). "The term 'age' means the age forty or above[.]" *W.Va.Code,* 5–11–3(k) [1994].

### IV.

■ The appellee's assertion that Dr. Decker's claim succeeds under a disparate treatment theory is without merit. Dispa-

---

**2.** In fact, Dr. Decker received a raise in salary. Although it may not have been the precise increase he desired, the amount was in full compliance with the five percent increase designated by the West Virginia Board of Regents applicable to every faculty member in the College of Business and Economics. The five percent increase applied to all faculty regardless of age, in every department, at every institution of higher education in the state.

rate treatment is applicable to claims of intentional discrimination, as opposed to claims that a facially neutral practice is having disparate impact upon a protected class. *Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986) is the age discrimination case where this court first spoke about the requirements to make a prima facie case using the disparate treatment theory. The court referred to the Supreme Court case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (a race discrimination case based on claims of disparate treatment) for authority and fashioned a general test for determining whether a plaintiff has made a prima facie case.[3]

In syllabus point 3 of *Conaway, supra,* we stated:

> In order to make a prima facie case of age discrimination under the West Virginia Human Rights Act, W.Va.Code, 5–11–1 *et seq.* [1979], the plaintiff must offer proof of the following:
>
> (1) That the plaintiff is a member of a protected class.
>
> (2) That the employer made an adverse decision concerning the plaintiff.
>
> (3) But for the plaintiff's protected status, the adverse decision would not have been made.

*See also Southern v. Emery Worldwide*, 788 F.Supp. 894 (S.D.W.Va.1992), *Dobson v. Eastern Associated Coal Corp.*, 188 W.Va. 17, 422 S.E.2d 494 (1992). After the *prima facie* case has been made, the "burden would shift to the employer to show some nondiscriminatory reason for the decision." *Conaway, supra,* 178 W.Va. at 171, 358 S.E.2d at 430.

That Dr. Decker met the first part of *Conaway's* test is undisputed because Dr. Decker was 61 years old at the time he claimed he was denied a raise. The second part requires that Dr. Decker prove that the University made an adverse decision affecting his salary or other conditions of employment. In the present case, Dr. Decker failed to produce any evidence that the University's compensation policy for hiring new faculty caused him to suffer any harm with respect to his salary.

No new faculty have been hired by the University for the College of Business and Economics in Dr. Decker's department of industrial and labor relations since it was created in 1977. Decisions by the University with regard to starting salaries or wage increases for faculty in departments or disciplines other than the College of Business and Economics, industrial and labor relations department, are irrelevant to the terms and conditions of Dr. Decker's employment.

But even if there had been new faculty members hired in Dr. Decker's department with less experience who were offered starting salaries at or over Dr. Decker's salary, he still could not prove that "but for" his age, the University would have acted differently. The academic marketplace composed of Colleges and Universities competing through compensation packages to attract the best and the brightest new faculty members, while juggling budget constraints, no doubt was in existence before Dr. Decker was born.

It is ridiculous to presume that "but for" Dr. Decker's age, the University would cease to compete for the best new faculty by offering competitive salaries determined in reference to the academic marketplace. Determination of competitive salaries for the successful recruitment of any highly skilled or specialized employee turns on the relevant entry level market value for those particular skilled

---

**3.** The *McDonnell Douglas* test requires the plaintiff in a race discrimination case to show that (1) he belongs to a racial minority; (2) he applied and was qualified for a job for which the employer was seeking applicants; (3) he was rejected; and (4) after his rejection the employer continued to seek applications from persons with the plaintiff's qualifications. 411 U.S. at 802 (1973).

If the plaintiff establishes disparate treatment, then the burden shifts to the defendant to offer a "legitimate, nondiscriminatory reason" for his actions. However, if the defendant fails to meet this burden, the plaintiff wins. When the defendant offers a legitimate nondiscriminatory reason, the burden shifts back to the plaintiff to present evidence of pretext. "[The Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

workers, not on the age of the incumbent workers. Thus, the third part of the prima facie test cannot be satisfied by Dr. Decker.

Dr. Decker failed to meet the general standard for proving a *prima facie* case of disparate treatment in employment established in *Conaway*. Even if he had met his burden, the University's statement that the policy was necessary to maintain accreditation and to compete with other top universities to attract qualified new faculty members, would constitute a legitimate· non-discriminatory reason, and no evidence of pretext was offered by Dr. Decker.

## V.

### A.

■ Disparate impact theory does not require proof of discriminatory motive. Unlike disparate treatment analysis, which turns on illegal motive, disparate impact turns on discriminatory *effect.* To prevail under disparate impact, the plaintiff must show that the defendant's facially neutral policy has a disproportionate adverse impact on the basis of the protected trait. *Guyan Valley Hospital, Inc. v. West Virginia Human Rights Comm'n,* 181 W.Va. 251, 253, n. 4, 382 S.E.2d 88, 90 (1989); *see also,* 42 U.S.C. § 2000e–2(k).

■ The adjudication of disparate impact claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and, arguably, the adjudication of claims arising under the Age Discrimination in Employment Act (ADEA), as amended, 29 U.S.C. § 621 *et seq.,* has been altered by the Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071, 42 U.S.C. § 2000e *et seq.* (November 21, 1991). Specifically, the 1991 Act states that when an employee proves that a particular employment practice causes an adverse impact on the protected class, both the burden of production and persuasion shift to the employer to show that the practice is both "job related" and "consistent with business necessity".[4]

This contrasts with the test set forth previously in *Wards Cove, supra* note 4, where the burden of persuasion was on the plaintiff at all times. *Wards Cove* merely required an offering of a legitimate business purpose by the defendant; no showing of business necessity was required. Significantly, Congress found that the Supreme Court's decision in *Wards Cove* had "weakened the scope and effectiveness of Federal civil rights protections; and ... legislation is necessary to provide additional protections against unlawful discrimination in employment." Civil Rights Act of 1991, Sec. 2., Pub.L. No. 102–166, Sec. 3, 105 Stat. 1071 (1991).

The Supreme Court has specifically declined to decide whether disparate impact theory is applicable to claims arising under the ADEA.[5] However, the majority of circuit courts considering this issue have decided to apply disparate impact analysis to claims arising under the ADEA.[6] *Geller v. Markham,* 635 F.2d 1027 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981); *Holt v. Gamewell Corp.,* 797 F.2d 36 (1st Cir.1986); *Wooden v. Board of Educ. of Jefferson County, Ky.,* 931 F.2d 376 (6th Cir.1991); *Fisher v. Transco Servs.—Milwaukee, Inc.,* 979 F.2d 1239 (7th Cir.1992) (assuming that disparate impact applies to ADEA claims); *Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419 (10th Cir.1993) (assuming disparate impact applies to ADEA claims). However, it is not necessary for this court to decide whether the 1991 Act has any bearing on the ADEA.

---

4. The 1991 Act expressly reinstated the law of "business necessity" as it existed before *Wards Cove Packing Co. v. Antonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) was decided. The 1991 Act states in its preamble that it is intended "to codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in *Griggs v. Duke Power Co.* and other Supreme Court decisions prior to *Wards Cove Packing Co. v. Antonio."* Civil Rights Act

1991, Pub.L. No. 102–166, Sec. 3, 105 Stat. 1071 (1991) (citations omitted)·.

5. *Hazen Paper Co. v. Biggens,* —— U.S. ——, ——, 113 S.Ct. 1701, 1710, 123 L.Ed.2d 338, 351–52 (1993) (Kennedy, J., concurring).

6. *Contra Martincic v. Urban Redevelopment Authority of Pittsburgh,* 844 F.Supp. 1073 (W.D.Pa. 1994) (disparate impact not a cognizable claim under the ADEA).

The appellant claims that disparate impact should not be applied in age discrimination claims. Unlike federal law [7], in West Virginia the legislature has not chosen to distinguish claims based on age from other protected classes under the Human Rights Act.[8] As a result we are not free to fashion such a distinction. Therefore, if disparate impact has been applied by this court to other cases arising under the Human Rights Act, ·it would similarly be applied to claims of age-based discrimination.[9]

In *Guyan, supra,* this court first held that a plaintiff unable to prove intentional discrimination under the Human Rights Act using a disparate treatment theory, may proceed under a disparate impact theory. (Black woman applied for nursing position, was not hired, and sued claiming race discrimination under the West Virginia Human Rights Act, *W.Va.Code,* 5–11–1 *et seq.* [1967]) *See also West Virginia Institute of Technology v. West Virginia Human Rights Comm'n, supra* note 8, 181 W.Va. at 529, n. 8, 383 S.E.2d at 494, n. 8; *Dobson v. Eastern Associated Coal Corp., supra.* In *Guyan,* we stated that " 'Disparate impact' is when employers do not deliberately discriminate, but their hiring practices have the *effect* of disproportionately excluding persons on the basis of race, *age,* and so forth[.]" *Guyan, supra,* 181 W.Va. at 253, 382 S.E.2d at 90 (emphasis supplied).

Our Human Rights Act prohibits deliberate treatment of persons differently because of different individual traits unrelated to the work environment. As we stated in *Guyan,* "[e]xamples of ... [work-related] traits are an ability to read, possession of a professional degree, physical strength, or experience in a given line of work. 'Illegal discrimination' means treating individuals differently because of some individual trait the law says can't legitimately be considered ... [e]xamples of such traits are race, *age,* sex, and handicap." *Guyan, id.* (Emphasis supplied).

In view of the language and purpose of the Human Rights Act as it now stands, and the language of this Court in *Guyan,* we now hold that there is a cause of action for "disparate impact" that applies equally to all claims arising under *W.Va.Code,* 5–11–1 [1967] *et seq.,* including age-based discrimination.

In *Guyan,* this court adopted the disparate impact test from *Wards Cove, supra* note 4, which was the most recent Supreme Court case interpreting Title VII of the Civil Rights Act of 1964, simply because uniformity in these matters is valuable *per se. Wards Cove* was decided in 1989, and incorporated by this court in *Guyan* even though both the alleged discriminatory hiring practice and the subsequent appeal occurred before 1989.[10] Thus, in view of the 1991 Civil

---

7. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* protects persons against employment discrimination on the basis of race, color, religion, sex or national origin. *See* 29 C.F.R. 1606.2 (1993).

   Section 703(k)(1)(A) which was added by the 1991 amendment states that: "An unlawful employment practice based on disparate impact is established under this title only if (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question, and consistent with business necessity; or (ii) the complaining party makes the demonstration ... with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice." [42 U.S.C. § 2000e–2]

   There is no explicit reference to age. The Age Discrimination in Employment Act (ADEA) 81 Stat. 602 (1967), as amended, 29 U.S.C. § 621 *et*

*seq.,* is listed as a separate Act with its own Congressional statement of findings and purpose, distinct and apart from Title VII.

8. With respect to disparate treatment cases, the West Virginia Human Rights Act treats each of the enumerated protected class categories exactly the same. *West Virginia Institute of Technology v. West Virginia Human Rights Comm'n,* 181 W.Va. 525, 383 S.E.2d 490 [1989].

9. The legislature finds the denial of rights to "properly qualified persons" because of any of the traits described above, is "contrary to the principles of freedom and equality of opportunity and is destructive to a free and democratic society." *W.Va.Code,* 5–11–2 [1989].

10. Cf. *Spicer v. Com. of Va.,* 818 F.Supp. 917 (E.D.Va.1993) (procedures and remedies made available by the Civil Rights Act of 1991 did not apply to claim filed after effective date of act based on conduct which occurred before effective date) Civil Rights Act of 1964, § 701 *et seq.,* as amended, 42 U.S.C.A. § 2000e *et seq.*

Rights Act with the stated purpose of codifying "the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in *Griggs v. Duke Power Co.,* 401 U.S. 424 [91 S.Ct. 849, 28 L.Ed.2d 158] (1971)", effectively overruling *Wards Cove* with respect to Title VII, we shall change the disparate impact test in *Guyan.* Today we adopt the statutory modifications, essentially returning us to the previous standard established by the Supreme Court in *Griggs,* for the same reason that we turned away from the *Griggs* standard, namely uniformity.

### B.

■ In proving a prima facie case of disparate impact under the Human Rights act, the plaintiff bears the burden of (1) demonstrating that the employer uses a particular employment practice or policy and (2) establishing that it causes a disparate impact on a class protected by the statute.[11] The employer then must prove that the practice is "job related" and "consistent with business necessity." If the employer proves business necessity, the plaintiff may rebut by showing that a less burdensome, alternative practice exists which the employer refuses to adopt.[12] Such a showing would be evidence that an employer's policy was a "pretext" for discrimination. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975).

■ "Disparate Impact in employment discrimination is ordinarily proved by statistics." *Dobson v. Eastern Associated Coal Corp, supra,* 188 W.Va. at 21, 422 S.E.2d at 497 (citing Syl. pt. 3, in part, *Guyan, supra.* Dr. Decker's theory of discrimination is that the University's alleged policy of paying salaries based on market rates to new faculty hires, but not paying incumbent professors based on market rates, has a disparate impact on older faculty of the College of Business and Economics because older faculty are the faculty members who have been at the University the longest.

The Human Rights Commission found that Dr. Decker successfully demonstrated that the University's policy had a disparate impact on faculty members over forty.[13] We agree. The focus then shifts to the University, which bears the burden of proving the policy is "job related" and a "business necessity".

### C.

■ The University's reliance on the AACSB survey for starting salaries means that the main factor affecting the initial salary of a new hire is his specific field or discipline. There can be no argument that this is *not* related to the job in the highly specialized faculty hiring context. Dr. Decker is a professor in the industrial and labor relations department, with a Ph.D. in industrial organization and psychology. There have been no new hires in Dr. Decker's department. It would be improper to compare Dr. Decker's salary to the starting salary for a new professor with a Ph.D. in marketing, hired to teach in the marketing department. There is nothing in the Human Rights Act that forbids employers from paying workers based upon their market value.

■ In specialized fields, subtle distinctions in technical knowledge may be rewarded with greater compensation. "Suppose we

---

**11.** See The Civil Rights Act of 1964, 78 Stat. 253 [1964], as amended 105 Stat. 1071 (1991). SEC. 703 [42 U.S.C. § 2000e–2] (1991) provides in subpart (k)(1)(A):

An unlawful employment practice based on disparate impact is established under this title only if—
(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party ... [offers] an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

**12.** This test parallels the federal standards in 42 U.S.C. § 2000e–2(k)(1)(A)(i), and 42 U.S.C. § 2000e–2(k)(1)(A)(ii) (1991).

**13.** "It is clear that salary compression and inversion, which results from the system the College uses for determining salaries, has a disparate impact on older faculty members." Commission's Final Order, p. 16, Finding of Fact No. 33. (Appellee's brief, p. 19.)

gave a hundred people extensive training as actors ... and set them loose at Sunset and Vine to seek their fortunes. What would we see if we came back ten years later? An equal distribution curve? Hardly. We'd see some actors working in commercials, some waiting on tables, and some, the Eddie Murphys of the world, commanding astronomical salaries. All this would make some economic sense. Eddie Murphy is worth millions, because his films make much more money than films of equally well-schooled actors who nevertheless don't have what Murphy has.

So it is in the rest of the economy, on a less dramatic scale. When the middle class consisted of workers tightening bolts on the assembly line, the difference between a superlative bolt-tightener and a merely competent bolt-tightener wasn't much, economically. As long as the bolts didn't come loose, management had no compelling reason not to pay both workers the same. But train those workers as computer repairmen, and the picture changes. The differences between a good repairman and a mediocre repairman are probably substantial, and worth rewarding. Train workers as computer *programmers*, and the picture changes even more. The difference between good and bad programmers is enormous, and employers will be tempted to recognize it with a big difference in pay." Mickey Klaus, *For a New Equality*, THE NEW REPUBLIC, 7 May 1990, p. 20.

The Commission found that the University failed to prove that the market based salary scale for new hires is justified by business necessity. The Commission suggests that the University could pay less than the median salary range for specific disciplines published annually in the AACSB survey, without sacrificing the University's academic standards. This would enable the University to pay existing faculty members more.

However, that would not be a viable option to advance the University's stated goal of attracting qualified professors with degrees from schools producing graduates with the most potential.[14] Dean Logar testified that hiring less qualified faculty will decrease the University's research productivity: "[s]ome of the faculty may not have their degrees; and as a result, we would be putting in jeopardy our accreditation." [15]

Under the current policy, the University struggles to compete with other research oriented universities in the AACSB. Setting starting salaries in reference to the determined market rates is a business necessity if accreditation and current standards of competence are to be maintained. Other courts reviewing this issue have not found this type of a policy to be age discrimination. *MacPherson v. University of Montevallo*, 922 F.2d 766, 772 (11th Cir.1991) (assuming that a University practice of paying market rates to newly-hired faculty members but not to others did have a disparate impact on older professors, the court still refused to find impermissible age discrimination); *see also Davidson v. Bd. of Gov. of State Colleges & Univ. for Western Illinois University*, 920 F.2d 441, 445 (7th Cir.1990) (if policy of University was to pay each faculty member's "reservation price or opportunity cost-the salary he would command in a no less attractive job with some other employer", no discrimination could be alleged even if younger faculty ended up getting paid more than the older ones).

The preeminent problem with disparate impact cases is that the disparate impact theory was designed to expand job opportunities for the laboring class, and in that regard it is a surpassingly useful tool. When jobs involve custodial work in nursing homes or bolt tightening on assembly lines, it is fairly obvious that old workers and young workers, black workers and white workers, male workers and female workers are doing what amounts to the same jobs.

---

**14.** Dean Logar testified that West Virginia is competing for graduates from schools like Virginia Tech, Georgia State, the University of Georgia, North Carolina, Chapel Hill, Ohio State, Penn State University, University of Pittsburgh, and the University of Maryland. (Tr. at 187–188) "[I]f we're going to be attracting these people, they will not talk to us at less than this amount of salary. If we drop below that [median], we will lose those faculty members." *Id.*

**15.** Tr. at 187–188.

In other contexts, however, evaluating what a person's real job description is, in terms of stress, workload and difficulty requires greater subtlety. Work, indeed, has two dimensions—length and intensity. The long working day of a fireman cannot be compared to the intense working day of a short order cook or the stressful day of a urologist doing radical prostatectomies. Factors like job security, job stress, flexibility of schedule, nature of day-to-day work, and prestige must be taken into account whenever a charge of discrimination based on age is made in the managerial or professional classes.

The record reveals that Dr. Decker has tenure. That is something for which every young professor yearns, and achieving such a position removes a substantial part of job-related stress. A young faculty member who must reasonably expect *not* to receive tenure after several probationary years, because increasingly universities are reluctant to award such status, must be compensated with short-term cash for what he or she fails to receive in long-term job security. Young faculty want money for being ridden hard and put away wet. Furthermore, we may reasonably infer from the record that tenured professors have preference over young, probationary faculty with regard to such things as course scheduling, the type of courses taught, office space, access to logistical support, travel budgets and other matters that are of supreme importance to the average executive or professional employee.[16]

The objective of anti-discrimination statutes was to break stereotypes and give people a chance who had previously been unjustifiably excluded from the work force. The strongest examples of disparate impact occur in entry level positions, and as a worker gains more seniority and moves up in rank, it becomes progressively harder to prove disparate impact using entry level positions as a reference point. This is because the longer a person is in a particular position, the less likely it is that his or her current position is equal in duties, benefits, and responsibilities, to an entry level position.

In the area of salary adjustments, an employer should be able to take into account different credentials and different qualifications of employees. Imposing too many restrictions on employers at the firing, or salary compensation level has a counterproductive effect on the goals of civil rights statutes in general. Indeed, all discrimination litigation that arises after entry level provides perverse incentives for employers to avoid potential liability or governmental control over business decisions, by refusing to let members of protected classes get a foot in the door.[17]

Differences in salary are certainly job related when we are discussing a position as a professor in a business school. The University did not engage in age discrimination by paying new faculty hires, irrespective of age, based upon the current fair market value for their specific disciplines. The Human Rights Commission needs to focus on striking a balance between protecting the rights of peo-

---

16. In the days when I served as chairman of the board of the old Kane and Keyser Hardware Company in Belington we regularly paid our salesmen, who were on commission, more than the president and secretary-treasurer of the company. Both president and secretary-treasurer were older workers who had been salesmen: they were very happy to accept lower pay for the comfort of air conditioned offices, no travel, and the luxury of a regular salary unrelated to the vagaries of commission compensation.

17. "[A] regime in which hiring cases predominate may differ substantially from one in which discharge cases do. Such a shift in the nature of Title VII litigation may alter the deterrent effect of the statute in such a way that generates some perverse consequences. Consider first an employer who is thinking about whether to hire a worker in a 'protected' category ... A worker who is not hired in the first place is obviously in no position to bring a future firing suit. Thus, an employer must consider the *increase* in expected costs when he hires a female or minority worker, because some probability exists that the worker will be fired and will sue.... Consequently, antidiscrimination laws may actually provide employers a (small) net disincentive to hire women and minorities.", John J. Donohue III & Peter Siegelman, *The Changing Nature of Employment Litigation*, 43 Stan.L.Rev. 983, 1024 (1991) (citation omitted). *See, also*, Mayer G. Freed & Daniel D. Polsby, "Just Cause for Termination Rules and Economic Efficiency", 38 EMORY L.J. 1097, 1143 (1989); Christopher Jencks, *Rethinking Social Policy*, 53–54 (Harvard Univ.Press 1992).

ple already in the work force, and preserving future employment opportunities for those who have yet to be hired.

Accordingly, for the reasons set forth above, the judgment of the Human Rights Commission is reversed.

Reversed.