605 S.E.2d 796

**Melissa R. PITTSNOGLE and Jennifer L. Wasson, Plaintiffs Below, Appellants**

v.

**WEST VIRGINIA DEPARTMENT OF TRANSPORTATION, Defendant Below, Appellee**

No. 31619.

Supreme Court of Appeals of West Virginia.

Submitted: Sept. 1, 2004.

Filed: Oct. 22, 2004.

Harry P. Waddell, Martinsburg, for the Appellants.

Curtis G. Power, III, Tracey R. Rohrbaugh, Bowles Rice McDavid Graff & Love, Martinsburg, for the Appellee.

PER CURIAM.

This is an appeal by Melissa Pittsnogle and Jennifer Wasson (hereinafter "Appellants") from a decision of the Circuit Court of Berkeley County granting summary judgment to the Appellants' former employer, the West Virginia Department of Transportation (hereinafter "Appellee"). The Appellants contend that the lower court erred by concluding that they had failed to present a prima facie case of disparate impact and in holding that the West Virginia Human Rights Act does not provide protection specifically to the subgroup of women with infant children. Upon thorough review of the arguments, briefs, and record in this matter, we affirm the decision of the lower court.

I. Factual and Procedural History

The Appellants were employed as consumer service representatives for the Appellee in its Martinsburg, West Virginia, regional office. Appellant Pittsnogle had been employed by the Appellee for approximately four years, and Appellant Wasson had been employed for approximately five years. In January 2001, having observed inconsistencies in the manner in which consumer service transactions were handled throughout its nine regional offices, the Appellee instituted a new policy for training requiring consumer service representatives to attend a three-week training conference at the Appellee's training facility in Winfield, West Virginia. The training was required for all consumer service representatives, regardless of length of service. The training sessions were offered four times per year, and all consumer service representatives were given a choice regarding which of the four sessions they wished to attend. According to the evidence presented below, the order of presentation of material during the training sessions was dictated by the schedules of the various speakers. Thus, the Appellee asserted that it would not be possible to complete the training by attending portions of several different sessions. The Appellee's policy was to reimburse employees for traveling to and from Winfield, West Virginia, as well as to pay for lodging and food for employees while there. The training was conducted only on Monday through Friday of each of the three weeks, and the employees were free to travel on the weekends at their own expense.

After receiving notification of the training requirement, the Appellants informed the Appellee that they did not wish to participate in the mandatory conference. On June 7, 2001, the Appellants filed a grievance, contending that training was not necessary and that attendance should not be mandatory. The Appellants explained that they did not wish "to go for three weeks training to learn a job we have been doing for years." The manager of the Martinsburg office rendered a Level I decision later that day, stating that he lacked the authority to provide the requested relief. He later rescinded that decision, explaining that it should have been heard by the Appellants' immediate supervisor. The grievance was re-filed, and the immediate supervisor decided that the relief sought was outside her authority.

On June 14, 2001, the Appellants filed a more specific grievance, delineating that they did not wish to be separated from their infant children for the three-week training sessions. They requested a reasonable accommodation based upon their family concerns and the fact that attendance at the training sessions would require travel from Martinsburg, West Virginia, to Winfield, West Virginia.[1] The Appellee informed the Appellants that the training sessions were mandatory and that their continued refusal to attend would result in termination. On June 18, 2001, the Appellants appealed their supervi-

---

1. Appellant Pittsnogle was the mother of a son, Austin, who was fifteen months of age by the October 15, 2001, discharge of the Appellant. Appellant Wasson was the mother of a daughter, Savannah, who was twenty months of age by October 15, 2001.

sor's adverse decision. A Level II Grievance Officer thereafter denied the Appellants' request and informed them that attendance at the training sessions was mandatory. By letter dated September 21, 2001, the Appellants again explained their refusal to attend, reasoning that the three-week seminar would cause financial hardship and separation from infant children.[2]

On October 15, 2001, the Appellants were terminated for their refusal to attend the training conference.[3] The Appellants thereafter filed a discrimination claim under the West Virginia Human Rights Act, West Virginia Code § 5–11–9 (1998) (Repl. Vol. 1999), specifically alleging that the Appellee's mandatory training policy requirements "discriminated against mothers of infant children who were unable to leave their children to attend the training for three weeks." The complaint also alleged that the Appellants had been discriminated against on the basis of the fact that they are "female employees who are the primary caregivers for young infants."

The Appellee sought summary judgment, and the lower court granted such relief in favor of the Appellee, finding that the Appellants had presented insufficient evidence of disparate impact and that the West Virginia Human Rights Act does not grant protection specifically to the subcategory of women with infant children. The lower court emphasized that the Appellants had "cite[d] no law supporting their assertion, but instead provide[d] the statistics of two journal articles supporting the proposition that women are the primary caregivers of infants." The Appellants had presented the articles, entitled *Who's Caring for Our Youngest Children? Child Care Patterns of Infants and Toddlers* and *Mothers' and Fathers' Gender–Role Characteristics: The Assignment of Postdivorce Child Care and Custody* " in an effort

to prove that women more often have primary responsibility for the care of infant children. The lower court recognized, however, that the Appellants had failed to compare the protected class to the non-protected class in the attempt to establish that the Appellee's policy had a disparate impact on women. The lower court stated: "The Plaintiffs in this case have not made a statistical comparison of the effect of the DMV's mandatory training policy had on women as opposed to men. In fact, the Plaintiffs are the only two persons that refused to abide by the policy and were discharged." The lower court found that there was no genuine issue of fact to be tried and that summary judgment for the Appellee was consequently warranted.

The Appellants now appeal that decision, contending that the lower court erred in ruling (1) that the Appellee's mandatory training policy did not have a disparate impact on women, and (2) that the West Virginia Human Rights Act does not provide specific coverage to the subcategory of women with infant children.

### II. Standard of Review

 The standard of review of a circuit court's entry of summary judgment is *de novo*. Syl. Pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). This Court has consistently held that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. Pt. 3, *Aetna Casualty & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). Additionally,

> [s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the

---

**2.** In the September 21, 2001, letter, the Appellants explained that "we are, as primary caregivers to infants unable to 'make arrangements for our children' to attend these training sessions...." The Appellants further stated that "[i]t has been the opinion of all other employees in our office, that have attended this training, that it is a waste of not only their time but also a great waste of money." The Appellants explained their continued unwillingness to attend

the training sessions, as follows: "Due to the fact that we will still be mothers, please accept this letter that we will be unable to attend these classes not only in October but also in December or anytime in the foreseeable future."

**3.** The Appellants were the only two employees who refused to attend.

nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove. Syl. Pt. 4, *Painter,* 192 W.Va. at 190, 451 S.E.2d at 756.

## III. Discussion

### A. General Requirements for Disparate Impact Claims

The disparate impact theory of employment discrimination was developed through federal law permitting a plaintiff to establish a prima facie case of discrimination by demonstrating that a defendant's policies or practices have an adverse impact on a statutorily protected class of persons. Through this mechanism, a plaintiff may prove that a facially neutral employment practice actually discriminates against a particular class based upon the disproportionate negative impact on that particular class. *Griggs v. Duke Power Co.,* 401 U.S. 424, 431–32, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The disparate impact model allows the inquiry to be directed toward "the *consequences* of employment practices, not simply the motivation." *Id.* at 432, 91 S.Ct. 849. It is thus "not only overt discrimination" that is proscribed, "but also practices that are fair in form, but discriminatory in operation." *Id.* at 431, 91 S.Ct. 849; *see also Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

■ This Court has addressed the disparate impact approach and has recognized that " 'the disparate impact theory [of employment discrimination] is invoked to attack facially neutral policies which, although applied evenly, impact more heavily on a protected group.' " *Morris Memorial Convalescent Nursing Home, Inc. v. West Virginia Human Rights Comm'n,* 189 W.Va. 314, 317, 431 S.E.2d 353, 356 (1993), *quoting Racine United Sch. Dist. v. Labor and Indus. Review Comm'n,* 164 Wis.2d 567, 476 N.W.2d 707, 718 (Ct.App.1991); *see also Moore v. Consolidation Coal Co.,* 211 W.Va. 651, 567 S.E.2d 661 (2002). As this Court explained in *Morris,* "there are two theories of employment discrimination, the disparate impact theory and the disparate treatment theory. The first theory focuses on the discriminato-

ry effect of the employer's acts, the second on the discriminatory motive of the employer." 189 W.Va. at 317, 431 S.E.2d at 356.

■ This Court instituted a specific framework for litigating claims of disparate impact in syllabus point three of *West Virginia Univ./West Virginia Bd. of Regents v. Decker,* 191 W.Va. 567, 447 S.E.2d 259 (1994):

In proving a prima facie case of disparate impact under the Human Rights Act . . ., the plaintiff bears the burden of (1) demonstrating that the employer uses a particular employment practice or policy and (2) establishing that such particular employment practice or policy causes a disparate impact on a class protected by the Human Rights Act. The employer then must prove that the practice is "job related" and "consistent with business necessity." If the employer proves business necessity, the plaintiff may rebut the employer's defense by showing that a less burdensome alternative practice exists which the employer refuses to adopt. Such a showing would be evidence that employer's policy is a "pretext" for discrimination.

In *Decker,* this Court specified as follows" "Unlike disparate treatment analysis, which turns on illegal motive, disparate impact turns on discriminatory *effect.*" 191 W.Va. at 572, 447 S.E.2d at 264.

### B. Statistical Evidence

In the present case, the specific area of inquiry is the establishment of the second prong of a disparate impact claim, requiring a plaintiff to present evidence, most effectively in the form of statistics, indicating that a particular employment practice or policy causes a disparate impact on a class protected by the Human Rights Act. The United States Supreme Court addressed the specific requirements for statistical evidence in disparate impact cases in *Wards Cove Packing Co., Inc. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). The Supreme Court initiated its discussion with the following general recognition: "Under this basis for liability . . . a facially neutral employment practice may be deemed violative of Title VII

without evidence of the employer's subjective intent to discriminate that is required in a 'disparate-treatment' case." 490 U.S. at 645–46, 109 S.Ct. 2115. In *Wards Cove,* cannery workers at two Alaskan fish canneries brought a discrimination suit premised on the employer's alleged racially discriminatory hiring practices. 490 U.S. at 645–48, 109 S.Ct. 2115. The primary evidence supporting their claim was the statistical racial disparity between the cannery workers and the higher-paid noncannery workers. *Id.* In evaluating the sufficiency of such statistical evidence, the Supreme Court specified that the proper statistical comparison is between the representation of the protected class in the employer's work force and in the *qualified* population in the labor force, unless the absence of unqualified persons was due in some manner to the employer's practices. *Id.* at 650–51, 109 S.Ct. 2115. Thus, the plaintiffs' presentation of statistics comparing cannery workers with noncannery workers was deemed insufficient to establish a prima facie case of disparate impact. *Wards Cove* established that if statistics are utilized, the proper comparisons are essential.

■ Likewise, this Court recognized as follows in syllabus point two of *Dobson v. Eastern Assoc. Coal Corp.,* 188 W.Va. 17, 422 S.E.2d 494 (1992): " 'Disparate impact in an employment discrimination case is ordinarily proved by statistics[.]' Syl. pt. 3, in part, *Guyan Valley Hosp., Inc. v. West Virginia Human Rights Comm'n,* 181 W.Va. 251, 382 S.E.2d 88 (1989), [*overruled on other grounds, West Virginia Univ./West Virginia Bd. of Regents v. Decker,* 191 W.Va. 567, 447 S.E.2d 259 (1994)]." Syllabus point three of *Guyan* observed as follows:

Disparate impact in an employment discrimination case is ordinarily proved by statistics; the proper comparison is "between the racial composition of the qualified persons in the labor market and the persons holding at-issue jobs." *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, [650, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733], 57 U.S.L.W. 4583, 4586 (1989).

In syllabus point two of *Guyan,* this Court stated:

A plaintiff makes out a case of disparate impact in hiring under *W.Va.Code,* 5–11–9 [1981], by identifying a particular hiring practice that has caused statistical under-representation of a given group within the relevant labor market; however, the burden remains on the plaintiff to demonstrate that the challenged practice is not fairly linked to job performance.

The *Guyan* Court concluded as follows in syllabus point four: "In an action for racial discrimination in hiring under *W.Va.Code,* 5–11–9 [1981], if there is no statistical disparity in the at-issue jobs, there can be no claim of disparate impact in hiring practices."

This Court also employed the disparate impact analysis in *Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 457 S.E.2d 152 (1995). In *Barefoot,* the plaintiff attempted to prove the alleged discriminatory effect of the defendant's employment practices upon Native Americans through a witness who testified about the decedent's discharge and other discharges. The plaintiff did not, however, present any statistical evidence comparing the discharge rate of the Native Americans to the general discharge rate of non-Native Americans. That precise inquiry was critical to the plaintiff's case. 193 W.Va. at 489, 457 S.E.2d at 166.

This Court concluded in *Barefoot* that the plaintiff failed to meet her burden of establishing that the defendant's policy caused a disparate impact on a protected class. The plaintiff had offered no statistical evidence comparing the protected class to the non-protected class. The Court explained that "[t]here is no basis in the record, logic, or common experience to suggest that a rule requiring automatic discharge of employees for hitting a patient would adversely affect Native Americans. In fact, it is so absurd that merely stating the contention gives cause to reject it." 193 W.Va. at 489, 457 S.E.2d at 166.

Commentators have also emphasized the necessity for the employment of specific types of statistical evidence, observing that an exhaustive presentation of statistical evidence requires the following:

voluminous discovery, thorough and detailed analysis of the employer's total organization and operation, and expert testimony by statisticians, industrial psychologists, and personnel managers. The statistical comparisons must be valid in terms of significance (based on a sample large enough to yield reliable results), scope (covering an appropriate category of employees), and time (covering an appropriate length of time).

Linda L. Holdeman, *Watson v. Ft. Worth Bank and Trust: The Changing Face of Disparte Impact*, 66 Den. U.L. Rev. 179, 182 (1989) (footnotes omitted); *see also Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n*, 453 N.W.2d 512, 517 (Iowa 1990). In the Holdeman commentary, it is noted that the "first stage of an impact case is much more burdensome than its counterpart in a disparate treatment *prima facie* case." 66 Den. U.L. Rev. at 182. "The plaintiff must demonstrate that a particular employment device has an adverse impact on a protected group in marked disproportion to its impact on employees outside that group. This *prima facie* case is almost entirely statistical." *Id.* (footnotes omitted).

## IV. Conclusion

■ This Court's review of the record, arguments, and relevant precedent reveals a fundamental flaw in the Appellants' presentation of a disparate impact claim. As outlined above, a prima facie case of disparate impact is primarily advanced through the utilization of statistical evidence to prove that the challenged employment policy has a discriminatory effect upon a protected class of individuals. The Appellants' statistical evidence in this case consisted of two journal articles indicating that women are customarily the primary caretakers of young children. No specific evidence comparing the impact on the protected class with the impact on the non-protected class was presented. The statistical proof presented in this case does not show disparate treatment between male and female consumer service representatives.

Our conclusion regarding the insufficiency of the Appellants' claims is not affected by whether the Appellants are classified as women or mothers with infant children.[4] The Appellants neither established their claim as women nor as mothers with infant children; therefore, the distinction is irrelevant to our conclusion that the lower court

4. The Second Circuit Court of Appeals requires a plaintiff attempting to prove an age discrimination disparate impact claim to "allege a disparate impact on the entire protected group, i.e., workers aged 40 and over." *Criley v. Delta Air Lines*, 119 F.3d 102, 105 (2d Cir.1997), *cert. denied*, 522 U.S. 1028, 118 S.Ct. 626, 139 L.Ed.2d 607. The plaintiffs in *Criley* had claimed that Delta Air Lines' hiring plan was discriminatory because of its disparate impact on certain pilots aged 55 and over. The plaintiffs acknowledged, however, that 94.1% of the pilots Delta hired were aged 40 and older and that the hiring policies had no negative impact on the overall group of pilots aged 40 and older. *See also Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1372–73 (2d Cir.1989), *cert. denied*, 494 U.S. 1026, 110 S.Ct. 1470, 108 L.Ed.2d 608 (1990). In *Lowe*, the Second Circuit Court of Appeals reasoned as follows:

Appellants in effect ask us to expand the disparate impact approach so as to include recognition of "sub-groups" in the analysis of the impact a hiring process has on the group that Congress has explicitly provided to be the protected group under the ADEA. Because Lowe and Delisi are in their fifties, they seek to define the protected group as those 50 or older. Under this approach, however, any plaintiff can take his or her own age as the lower end of a "sub-protected group" and argue that said "sub-group" is disparately impacted. If appellants' approach were to be followed, an 85 year old plaintiff could seek to prove a discrimination claim by showing that a hiring practice caused a disparate impact on the "sub-group" of those age 85 and above, even though all those hired were in their late seventies. We do not believe that such a "disparity" would support the inference of discrimination that the disparate impact approach permits when those outside a statutorily protected group are preferred over those included in that group. We find no support in the case law or in the ADEA for the approach to disparate impact analysis appellants advocate.

*Id.* at 1373.

The parties have not cited any instance in which the classification of women with infant children was specified as a subcategory of the protected class in a disparate impact discrimination case; nor has this Court's research revealed such a case. In any event, whether applied to a subcategory of women or broadened to women generally, the evidence submitted by the Appellants simply does not satisfy the requirements regarding evidence of statistical differences in impact between women and men.

properly granted summary judgment to the Appellee.[5]

Affirmed.

Justice McGRAW dissents.

---

**5.** While the Appellee's failure to provide any reasonable accommodation to the Appellants is unfortunate, the Appellants have not presented a prima facie case of discrimination. This Court has consistently recognized that not all unfair or unpopular business decisions are discrimination. Certain employer actions may appear unjust or unacceptable to a juror or even to a reviewing court; yet such actions do not necessarily constitute discrimination. As this Court noted in *Con-away v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986), "the reason need not be a particularly good one. It need not be one which the judge or jury would have acted upon. The reason can be any other reason except that the plaintiff was a member of a protected class." 178 W.Va. at 171, 358 S.E.2d at 430. The reason cannot, of course, violate a substantial public policy, as in *Harless v. First National Bank*, 162 W.Va. 116, 246 S.E.2d 270 (1978).