479 S.E.2d 561

**Alfred M. SKAGGS, Plaintiff Below, Appellant,**

v.

**ELK RUN COAL COMPANY, INC., a West Virginia Corporation, Defendant Below, Appellee.**

No. 23178.

Supreme Court of Appeals of West Virginia.

Submitted April 30, 1996.

Decided July 11, 1996.

Debra Kilgore, Burton & Kilgore, Princeton, for Appellant.

Daniel L. Stickler, Gregory S. Metzger, Jackson & Kelly, Charleston, for Appellee.

CLECKLEY, Justice:

The appellant herein and plaintiff below, Alfred M. Skaggs, appeals the Circuit Court

of Raleigh County's denial of the plaintiff's motion to set aside the verdict in the jury trial and to grant a new trial. On appeal, the plaintiff raises several issues regarding evidentiary and instructional errors committed by the trial court. For reasons detailed below, we find the trial court's instruction contained reversible error and we order a new trial.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The plaintiff was hired by the appellee herein and the defendant below, Elk Run Coal Company, on January 4, 1982, as a mine safety and health administrator. The plaintiff has a Bachelor of Science Degree in forestry and a Master's Degree in safety management and previously worked as a safety and training specialist at the federal Mine Safety and Health Administration.

The plaintiff testified that he not only listed that he was a disabled veteran on the employment application but that he discussed his injuries during the job interview and informed the interview committee that he had a 10 percent disability and that his doctor had ordered certain restrictions on his physical activities.[1] These restrictions included limitations on sitting and standing for long periods and lifting objects weighing over twenty-five pounds. However, the defendant asserts that during this interview the plaintiff made reference to only a minor disability. Apparently, because they were looking for someone to perform administrative duties as opposed to physical labor, the committee discussed the plaintiff's disability and decided to hire him, despite his physical problems. Thereafter, the plaintiff worked in the job of mine safety and health administrator for approximately five and one-half years. This job consisted of being a qualified instructor in many required classes for coal miners and completing paperwork for various purposes, including mine accidents, violations, and coordination with state and federal agencies.

The plaintiff's job changed in July of 1985. Larry Ward, who was a member of the interview committee when the plaintiff was hired, became the vice-president and general manager of the defendant. After his promotion, Mr. Ward asked the plaintiff to prepare a written description of his job duties. According to the plaintiff, Mr. Ward's evaluation did not take into account 50 percent of the plaintiff's job duties. Following the assessment, Mr. Ward reassigned the plaintiff to work in the laboratory four hours a day. The defendant denies that it eliminated duties and contends instead that the plaintiff's job actually required only 50 percent of his time; thus, additional duties were assigned. As a lab assistant, the plaintiff was responsible for collecting coal samples. According to the plaintiff's brief, this job required a considerable amount of physical labor, which included walking to the various sections of the plant, retrieving coal samples that weighed approximately sixty to eighty pounds, and returning them to the plant lab. After weighing the samples, the plaintiff had to place them into the crusher, which required him to lift the bag over his head. This form of physical labor purportedly caused serious physical pain to the plaintiff. At first, he performed the work part-time; later, the plaintiff's remaining job duties were divided between two other people and he was permanently assigned as a lab assistant. The plaintiff worked in this job for approximately three months.

Subsequently, the plaintiff was reassigned as a lab technician. Although his primary duty was to analyze coal samples, the plaintiff still was required to perform some lab assistant duties such as collecting and preparing coal samples. The plaintiff asserts this job required a considerable amount of standing on concrete floors, which aggravated his condition. A stool was provided, but the plaintiff claims it was of little use because the counters contained no openings beneath them. Thus, he was unable to get his legs or knees underneath the cabinet. At trial, the plaintiff also asserted this accommodation

---

1. The plaintiff asserts that he sustained neck and back injuries during his service in the Army reserves.

lasted only a few days because the scale he used had to be moved so he could use his stool. Apparently, others using the scale did not like the scale being moved because that required recalibrating the scale. So, this option was abandoned. Some accommodations were provided by the defendant, including a back support the plaintiff requested, a scoop, and rubber mats were placed on the floor, which the plaintiff admitted were of some help.

The plaintiff claims that, as a result of his lab technician duties, he continued to suffer considerable pain. Furthermore, it was asserted the plaintiff constantly was told to improve his job performance. Witnesses testified the work at the defendant's laboratory was more than any one man could handle. One witness, James Lester, testified that when the plaintiff arrived at work, he regularly was monitored by his direct supervisor, John W. Christian, who would make sarcastic comments and generally harass the plaintiff throughout the day about whether he was punctual. For example, before work would start, witnesses indicated Mr. Christian would go to the bathhouse,[2] look at his watch, and tell the plaintiff he only had one minute before work started. Jim Mitchell testified that although Mr. Skaggs always seemed punctual (i.e., arriving at work five minutes early), Mr. Christian would always come down to where the employees gathered before work to look for the plaintiff. Another witness, Leonard Parker, was an independent contractor for the defendant and worked in the lab with the plaintiff. Mr. Parker described Mr. Christian's comments towards the plaintiff as negative. He, in fact, testified that Mr. Christian commented the plaintiff was an old man and too slow.

The plaintiff continued to work in the lab from July, 1987, until his discharge on March 8, 1991. There were a few occasions when the plaintiff worked in the scale house and warehouse—both jobs also consisted of a great deal of walking and standing. In fact, the plaintiff testified that as a result of working in the warehouse his back pain was aggravated and required medical attention.

The plaintiff's doctor wrote to the defendant concerning the plaintiff's condition. In response, the defendant transferred the plaintiff back to the lab the day after the letter was sent. The defendant claims the plaintiff was transferred because the midnight shift "did not agree with his system." During this entire period, the evidence shows the plaintiff worked in jobs that required a substantial amount of physical labor.

The plaintiff asserts that while he was working at the lab, he received complaints and written disciplinary notices concerning his alleged poor attitude, poor work production, and late arrival to work. He contends, however, that he was late for work only two or three times during the entire course of his employment and that on each such occasion he received a disciplinary memo. On March 3, 1991, the plaintiff was given a memo that summarized a meeting between him, Mr. Christian, and Mr. Tom Pysell[3] and that recounted their complaint concerning the plaintiff's slow speed and low production. The meeting also concerned an incident where the plaintiff made a 26 percent error in a coal analysis. Mr. Pysell testified that such a large percentage difference between the expected outcome and the actual outcome of the test should have raised concern that there was an error and that the test needed to be rerun. Moreover, Mr. Pysell testified the defendant is penalized in its contracts for every percentage point it is off, or it even could lose the contract altogether. Following this memo, the plaintiff was transferred to the position of a lab assistant in the lower lab and informed by management personnel that they were not going to tolerate a subpar job performance. The lower lab position consisted of a considerable amount of physical labor. The plaintiff worked at this job for three days before he was fired.

The defense elicited testimony at trial confirming its theory that despite the accommodations made for the plaintiff, he was still not performing his job adequately. Mr. Chris-

---

**2.** The bathhouse was a place where many employees gathered before work.

**3.** Mr. Pysell was the plant superintendent. Mr. Christian reported to Mr. Pysell.

tian testified during his deposition[4] that many of the other workers who worked with the plaintiff complained to him about the plaintiff. The coworkers generally protested the plaintiff did not provide assistance to the other workers, even when he finished all his assigned duties. Moreover, Mr. Christian testified the plaintiff left work early and was late to work frequently, repeatedly made errors, had a poor attitude about performing his work, and failed to follow suggested procedures for increasing efficiency. The defense presented evidence showing the plaintiff and his supervisors met on a number of occasions to discuss his poor job performance. The plaintiff was asked at other times what else could be done to help him with his job and the plaintiff's only reply was that he was working as well as he could. Mr. Pysell testified at trial that the plaintiff told him he did not like the lab job for three reasons: (1) He did not like lab work; (2) he felt he was cheated out of the safety job; and (3) he did not like working for a younger man.

At trial, the defense moved to exclude evidence that the defendant failed to offer the plaintiff the available position of safety trainer when the plaintiff's job in mine safety and health was eliminated. The plaintiff argued the evidence would show the defendant's motive to discriminate. The plaintiff sought to show the defendant had knowledge of his physical impairments and still placed him in a job that he had no experience in or training for and that demanded a substantial amount of physical labor. The plaintiff also proffered the evidence to prove that he had a "right to avail himself of Defendant's existing policies and utilize the available employment opportunities." The trial court ruled that under our decision in *Coffman v. West Virginia Board of Regents*, 182 W.Va. 73, 386 S.E.2d 1 (1988), the defendant had no duty to transfer the plaintiff to other positions and thus excluded the plaintiff's evidence on this point.

Again relying on *Coffman, supra,* the trial court also excluded evidence of the position of surface quality coordinator, which was available at the time of plaintiff's dismissal. The plaintiff vouched the record with the testimony of his vocational expert, Robert Williams, and a former lab technician, Marshall Birchfield, to demonstrate the plaintiff's qualifications and his physical abilities to perform as a surface quality coordinator. A rehabilitation counselor analyzed the plaintiff's job duties as a lab technician and surmised that, although the plaintiff was competent to perform the job description, his impairment substantially limited his ability to carry out the job as a lab technician. Recommendations for changes that would have been beneficial to the plaintiff were made. An orthopedic surgeon also testified about the plaintiff's disabilities.

The defendant denies the plaintiff was fired for any physical disability. Although questioning the actual severity of his disability, the defendant claims to have taken numerous steps to accommodate the plaintiff whenever he complained of any discomfort. The defendant insists the plaintiff was discharged because of his poor job performance despite all attempts to counsel and accommodate the plaintiff. The defendant claims, in fact, that every accommodation suggested by Mr. Williams, with the exception of changing the counter tops in the lab, were made for the benefit of the plaintiff.[5] Moreover, the defendant claims it attempted to accommodate the plaintiff by reducing his workload and hiring additional assistants, in addition to purchasing devices to help the plaintiff. On appeal, the defendant contends the trial testimony supported its argument that all the employees accepted the "plaintiff's complaints at face value[;]" thus, educating the employees about the plaintiff's physical disabilities, as suggested by the plaintiff's expert witness, was unnecessary.

A trial resulted in a jury verdict for the defendant. The plaintiff moved to set aside the verdict and for a new trial. These motions were denied by the trial court. The plaintiff appeals the denial of his motions.

---

4. Mr. Christian's deposition was admitted at trial because he was deceased at the time of trial.

5. According to the defendant's brief, the suggestion to change the counter tops was impractical because of the functions performed in the lab.

## II.

## DISCUSSION

### A.

#### Standard of Review

■■■ The plaintiff appeals two categories of issues: (1) whether the trial court committed reversible error by excluding evidence concerning the availability of other jobs; and (2) whether the instructions given by the trial court incorrectly stated the evidentiary burden on the plaintiff in pretext and mixed motive cases. Ordinarily, review of evidentiary rulings is under the abuse of discretion standard. We review *de novo*, however, legal premises upon which a trial court based its evidentiary rulings. Therefore, when the question involves issues of "materiality," our cases have suggested the review is plenary. In *Province v. Province,* 196 W.Va. 473, 481, 473 S.E.2d 894, 902 (1996), we recently stated "the extent to which the ruling turns on materiality or interpretation of our law, the standard of appellate review is plenary." (Citation omitted). Of course, our review of the legal propriety of the trial court's instructions is *de novo. State v. Guthrie,* 194 W.Va. 657, 671, 461 S.E.2d 163, 177 (1995). We now address, in turn, the evidentiary and jury instruction issues.

### B.

#### Evidence of Other Available Job Positions

1. Disability Discrimination Generally

The plaintiff's first assignment of error is that the trial court erred in excluding evidence relating to the availability of (1) a safety trainer position when the plaintiff was transferred to the laboratory and (2) the surface quality coordinator position when the plaintiff was discharged.

The central issue this assignment of error raises is whether evidence of the availability of other jobs is probative to prove a "fact that is of consequence" in this case. Rule 401 of the West Virginia Rules of Evidence provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of *any fact that is of consequence* to the determination of the action more probable or less probable than it would be without the evidence." *See* 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 4–1(C) at 201 (3rd ed.1994) (under W.Va.R.Evid. 401, relevancy " 'exists only as a relationship between an item of evidence and a matter properly provable in the case.' " (Citation omitted)). To assess whether the excluded evidence was admissible, it is necessary for us to review the principles regarding discrimination against disabled individuals.

■■■ Both the West Virginia Human Rights Act (Human Rights Act) [6] and the federal Americans with Disabilities Act of 1990(ADA) prohibit employment discrimination against a qualified individual with a disability. W. Va.Code, 5–11–9 (1992); 42 U.S.C. §§ 12101–12213 (1990). This prohibition extends, of course, to the denial of employment opportunities based on vocationally irrelevant disabilities and, thus, embraces the traditional employment discrimination theories of disparate treatment and disparate impact. *See generally Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 457 S.E.2d 152 (1995). The disparate treatment model provides that an employer may not deny job opportunities to qualified individuals because of their disabilities. Thus, the law protects persons with impairments from being denied employment by virtue of an employer's hostility to those who are disabled or its stereotypical assumptions about their capabilities. *See, e.g., Davidson v. Shoney's Big Boy Restaurant,* 181 W.Va. 65, 380 S.E.2d 232 (1989). In such cases, an employer's animus determines its liability. The disparate impact model bars an employer from relying on employment criteria that disproportionately affect a protected class but which are not job related. *See, e.g., West Va. Univ./W. Va. Bd. of Regents v. Decker,* 191 W.Va. 567, 447 S.E.2d 259 (1994).

■■■ In addition to legislating against those traditionally recognized forms of discrimination, the ADA also expressly provides that unlawful discrimination can occur when

---

**6.** Our Human Rights Act is set forth in W. Va. Code, 5–11–1, *et seq.*

an employer *fails* to consider an applicant's or employee's disability where its adverse effect on the individual's job performance can be avoided. ADA, § 102(b)(5); 42 U.S.C. § 12112(b)(5). That is, employers have an affirmative obligation to provide reasonable accommodation for disabled individuals.[7] Although our Human Rights Act does not have an explicit analogue to Section 102(b)(5), the West Virginia Human Rights Commission (Commission) and this Court have inferred that our Human Rights Act imposes this duty of reasonable accommodation. *See* 77 W. Va.C.S.R. 1, § 4.4 (1994); *Morris Mem. Convalescent Nursing Home, Inc. v. West Va. Human Rights Comm'n*, 189 W.Va. 314, 431 S.E.2d 353 (1993); *Coffman v. West Va. Bd. of Regents*, 182 W.Va. 73, 386 S.E.2d 1 (1988).

██ Thus, the ADA and our Human Rights Act prescribe strong medicine to cure the social maladies of intentional and unnecessary denials of job opportunities to persons with disabilities. The medicine works through the laws' natural hortatory and educational effect and through their remedial provisions that empower courts to correct unlawful practices, make their victims whole, and deter other acts of discrimination by attaching to them serious economic consequences. In applying our statutes, we remain mindful that, as a remedial law, it should be liberally construed to advance those beneficent purposes. *See State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 461 S.E.2d 516 (1995).

In this case, the plaintiff alleges both a disparate treatment claim and a failure to accommodate claim. Under the former theory, the plaintiff charges that the defendant intentionally placed him in jobs it knew he could not perform, that it refused to consider him for jobs for which he was qualified, that it took those actions with the design to effectuate his discharge, and that the defendant desired to terminate him because of his disability. The "failure to accommodate" claim alleges the defendant refused to consider the plaintiff for vacant positions for which he was qualified. Due to the fact that the relevancy/materiality analysis and our standard of review differ between the two claims, we discuss them separately.

### 2. Admissibility under the Disparate Treatment Claim

The plaintiff attempted to admit the evidence of the vacant positions to prove the defendant's hostility towards him and to show he was not treated consistently with the defendants's alleged policy of giving preference to in-house employees. The plaintiff's contention is not untenable; if an employer routinely transfers employees to vacant jobs to avoid lay-offs or to better match an employee's abilities with the employer's needs, then a failure to accord a member of a protected class that consideration would raise an inference of discrimination. The plaintiff also argued that the evidence was relevant to rebut the defendant's contention it did all that it could do to accommodate the plaintiff. That, too, is a plausible argument. On either basis, the trial court could have found the evidence admissible, but that decision is entirely a matter of relevancy (as opposed to materiality) and is committed primarily to the trial court's discretion. Our review, therefore, is limited. The pertinent inquiry is not whether we would have ruled the same way but, rather, whether any reasonable judge would have agreed with the trial court. *See State v. Gibson*, 181 W.Va. 747, 754–55, 384 S.E.2d 358, 365–66 (1989).

██ In light of that standard, we cannot, on this record, conclude that the trial court's ruling was in error. Certainly, the trial court could have concluded that the 1987 vacancy was too remote in time to justify either an inference of discriminatory intent or the investment of trial time needed to explore the facts. As to the 1991 vacancy, the trial court properly could have concluded that the probative value of the evidence was relatively slight and that the danger of confusion of the issues justified its exclusion. Evidence may be excluded under Rule 403 of the

---

**7.** Therefore, it is the case that an employer may not consider an employee's or applicant's impairment in making employment decisions if the impairment does not affect his or her ability to perform the job but it must consider the impairment to determine whether an accommodation is needed and available to permit the employee or applicant to perform the job.

West Virginia Rules of Evidence where the offered evidence would necessarily prolong the trial and it has slight probative value. *Cf. United States v. Ricks*, 882 F.2d 885, 891–92 (4th Cir.1989), *cert. denied sub nom., King v. U.S.*, 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 841 (1990) (similar to Rule 403 of Federal Rules of Evidence). Nevertheless, given the conclusion we reach in Part II–C, *infra*, that this case must be remanded and given our uncertainty about whether the trial court performed a Rule 403 analysis or simply concluded (erroneously) that *Coffman, supra*, made the evidence inadmissible,[8] we direct the trial court on remand to reconsider the issue and set out on the record its Rule 403 reasoning and conclusions. *See State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994).

▮ As our discussion above indicates, if the plaintiff's case on disparate treatment is the same as on this record, we would be reluctant to disturb either a ruling admitting the evidence or one excluding it. When the trial court already has balanced prejudice and probativeness in making an evidentiary ruling, this Court is especially reluctant to intervene. *See State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731, 744 (1994) ("The Rule 403 balancing test is essentially a matter of trial conduct, and the trial court's discretion will not be overturned absent a showing of clear abuse.").

### 3. Admissibility Under the Failure to Accommodate Claim

▮ As currently defined by the Commission, " '[r]easonable [a]ccommodation'

means reasonable modifications or adjustments to be determined on a case-by-case basis which are designed as attempts to enable an individual with a disability to be hired or to remain in the position for which he was hired." 77 W. Va.C.S.R. 1, § 4.4, in part. To comply with our Human Rights Act, an employer must make reasonable accommodations for known impairments to permit an employee to perform the essential functions of the job. *See Morris Memorial Convalescent Nursing Home, Inc.*, 189 W.Va. at 318, 431 S.E.2d at 357, *citing Southeastern Community College v. Davis*, 442 U.S. 397, 412–13, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980, 992 (1979), *modification recognized by Tuck v. HCA Health Servs. of Tenn.*, 842 F.Supp. 988 (M.D.Tenn.1992), *aff'd*, 7 F.3d 465 (7th Cir.1993). To state a claim for breach of that duty, a plaintiff may prove the following elements:

(1) The plaintiff is a qualified person[9] with a disability;

(2) The employer was aware of the plaintiff's disability[10];

(3) The plaintiff required an accommodation in order to perform the essential functions of the job;

(4) A reasonable accommodation existed that would meet the plaintiff's needs;

(5) The employer knew or should have known of the plaintiff's needs and of the accommodation; and

(6) The employer failed to provide the accommodation.[11]

---

**8.** In asserting the trial court did not abuse its discretion in excluding the evidence, the defendant emphasizes that the judge reviewed the propriety of admitting or excluding the disputed evidence on three occasions and that his ruling, therefore, was not a blanket evidentiary exclusion. The defendant then suggests that the judge balanced the probative value with the danger of unfair prejudice, as prescribed by Rules 402 and 403 of the West Virginia Rules of Evidence. The plaintiff disputes whether the judge actually engaged in the probative versus prejudicial analysis concerning the admissibility of prior acts of the defendant.

**9.** The duty to accommodate does not require employers to retain employees who cannot fulfill the essential functions of the job. The law protects only "qualified" individuals with disabilities

who, with or without reasonable accommodation, can perform the essential nature of the job. *See Ranger Fuel Corp. v. West Va. Human Rights Comm'n*, 180 W.Va. 260, 376 S.E.2d 154 (1988).

**10.** Obviously, an employer who had no knowledge of an employee's disability cannot be held liable for not accommodating that disability. We interpret our law to require reasonable accommodation for *known* physical or mental disabilities. In the instant case, there is no reasonable dispute about whether the defendant knew of the plaintiff's disabilities.

**11.** These factors apply to most accommodation cases. There may, however, be some variation. For example, a plaintiff also could state a claim by alleging an employer refused to consider or

Our regulations state that "[r]easonable accommodations include, but are not limited to" altering facilities; restructuring jobs, work schedules, and assignments; reassigning the employee "to a vacant position for which the person is able and competent . . . to perform"; acquiring or modifying equipment to provide "readers or interpreters"; adjusting testing, training materials, or policies; and educating fellow workers. 77 W. Va.C.S.R. 1, § 4.5.

■■■■ An employer may defend against a claim of reasonable accommodation by disputing any of the above elements or by proving that making such accommodation would impose an undue hardship on the employer. The latter is an affirmative defense, upon which the employer bears the burden of persuasion. *E.g.,* ADA, § 102(b)(5)(A), 42 U.S.C. § 12112(b)(5)(A); *Barth v. Gelb,* 2 F.3d 1180 (D.C.Cir.1993), *cert. denied,* 511 U.S. 1030, 114 S.Ct. 1538, 128 L.Ed.2d 190 (1994) (Rehabilitation Act). In determining whether an accommodation imposes an undue hardship, the trial court should consider the nature and cost of the accommodation, the financial resources of both the facility involved and the employer as a whole, and the type and characteristics of the employer's operation. 77 W. Va.C.S.R. 1, § 4.6; *see Nelson v. Thornburgh,* 567 F.Supp. 369, 379–80 (E.D.Pa.1983), *aff'd,* 732 F.2d 146 (3rd Cir.1984), *cert. denied,* 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985).

"Reasonable" and "undue" are both relative terms, and their application will often depend upon overlapping facts. Both imply

some assessment of costs and effectiveness and of the relationship between costs and effectiveness. *Vande Zande v. Wisconsin Dept. of Admin.,* 44 F.3d 538 (7th Cir.1995). The designation of whether an issue be considered as relating to undue hardship rather than reasonable accommodation (or vice versa) has significance because it determines who bears the risk of nonpersuasion.[12]

■■■■ We need not, at this time, set down any elaborate analysis for resolving this potentially troublesome issue. It is sufficient for present purposes to note that the reasonableness of a proposed accommodation normally will depend upon a general analysis of costs and effectiveness. Whether a resulting hardship is undue typically will focus the factfinder on the impact of the accommodation on the particular employer. For example, the Interpretive Guidance on Title 1 of the Americans with Disabilities Act, 29 C.F.R.App. § 1630.2(p) (1995), offers the illustration of a vision impaired individual who has difficulty seeing in dim lighting. To require an employer to accommodate the impairment by enhancing the workplace light certainly would be reasonable. A particular employer, however, might have a business-specific concern that would cause it to suffer undue hardship; thus, a nightclub could mount a defense that the particular accommodation, "though inexpensive, would impose an undue hardship if the bright lighting would destroy the ambience of the nightclub and/or make it difficult for the customers to see the stage show." 29 C.F.R.App. § 1630.2(p) at 408.[13]

discuss accommodation—even though it then was unaware of any particular accommodation and even though the plaintiff did not identify the accommodation—so long as some accommodation was possible at the time the adverse action was taken against the plaintiff. As with all our employment discrimination doctrines, flexibility and common sense must guide decisionmaking. *Morris Memorial Convalescent Nursing Home, Inc.,* 189 W.Va. at 318, 431 S.E.2d at 357, *citing Kut–Kwick Corp. v. Johnson,* 189 Ga.App. 500, 376 S.E.2d 399 (1989) (elements in discrimination cases must not be applied woodenly but must be tailored to fit the circumstances of each type of discrimination). As we make clear below, the plaintiff's claim based on reasonable accommodation is subject to the affirmative defense of undue hardship.

**12.** For example, if an issue is whether a particular accommodation is too costly, a defendant naturally will contend that the costs make the adjustment "unreasonable," while a plaintiff will counter that costs should be considered as part of the "undue hardship" defense. *See Vande Zande, supra.*

**13.** A commentator has summarized the point as follows:

" 'Reasonable accommodation' inquiries and 'undue hardship' defenses are related issues. One way to understand the difference between these two inquiries is to focus on the level of generality. 'Reasonable accommodation' inquiries tend to focus at a higher level of generality—whether an accommodation, for example, fundamentally alters the structure or

Determinations about the reasonableness of an accommodation or the impact of its hardship must be done on a case-by-case basis, with careful attention to the particular circumstances and guided by the Human Rights Act's policy of enhancing employment opportunities for those with disabilities through workplace adjustments. Essentially, the law mandates common sense courtesy and cooperation. "Accommodation" implies flexibility, and workplace rules, classifications, schedules, etc., must be made supple enough to meet that policy.[14] "Undue hardship" implies a balancing, and the employer's interest in avoiding costs and disruption can furnish a defense only when they outweigh the policy gains.

With those general considerations as guides, we offer some further, more specific comments that the facts of the present case suggest are needed. The law does not necessarily require an employer to offer the precise accommodation an employee requests, at least so long as the employer has offered some other accommodation that permits the employee to fully perform the job's essential functions and has a reason for not providing the requested accommodation. (Of course, the employer can reject any accommodation that would impose an undue hardship.) Nor does an employer have a duty to displace other employees in order to accommodate a disabled employee. On the other hand, the handicap discrimination laws force employers to focus on the individual and not on his or her disabilities. *See Davidson, supra.*

In cases where an employer asserts that it accommodated an employee but the employee still was unable to perform the job, the employee is not required in rebuttal to demonstrate that his performance was flawless or superior. Rather, the employee need only show that he or she capably performed the job. Pertinent to this case, if a particular task is not essential or is performed only occasionally, reasonable accommodation may require an employer to reassign that specific task to another employee. *See Overton v. Reilly,* 977 F.2d 1190, 1195 (7th Cir.1992). Employers cannot legitimate their failure to hire, promote, or transfer a disabled individual if they can remedy an individual's inability to perform the required job function through reasonable accommodation, such as providing special equipment or making a simple change in job structure. Where an employer can accommodate a disabled individual without undue burden, the refusal to make necessary accommodations can become unreasonable and discriminating.

The process by which accommodations are adopted ordinarily should engage both management and the affected employee in a cooperative, problem-solving exchange. The federal regulations implementing the ADA state:

"To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(*o*)(3) (1995).

Similarly, the appendix to 29 C.F.R. § 1630.9 at 414 (1995), provides: "[T]he employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." Neither the West Virginia statutes nor the federal law assigns responsibility for when the interactive process is not meaningfully undertaken, but we infer that neither party should be able to cause a breakdown in the process. The trial court should look for signs of failure

---

nature of the program. 'Undue hardship' inquiries tend to focus on the financial resources of a particular entity." Ruth Colker, *The Law Of Disability Discrimination* 212 (1995).

**14.** "It is plain enough what 'accommodation' means. The employer must be willing to consider making changes in its ordinary work rules, facilities, terms, and conditions in order to enable a disabled individual to work." *Vande Zande,* 44 F.3d at 542.

to participate in good faith or to make reasonable efforts to help the other party determine what specific accommodations are necessary and viable. A party that obstructs or delays the interactive process or fails to communicate, by way of initiation or response, is acting in bad faith. When information necessary for a meaningful determination of accommodation only can be provided by one party, the failure to provide that information is considered an obstruction.[15] The determination must be made in light of the circumstances surrounding a given case.

As we state above, the disagreement between the parties about whether the trial court improperly excluded evidence of job vacancies centers primarily on this Court's opinion in *Coffman, supra.* In that case, the plaintiff, who worked as a custodian at one of our State universities, had a chronic back problem. To accommodate the condition, the employer teamed the plaintiff with another custodian to clean hospital rooms; the plaintiff did the "high" cleaning, and her partner did the "low" cleaning. Although the team assignment apparently met the employer's needs, it nevertheless decided that the arrangement altered the fundamental nature of the job and that the plaintiff's back condition prevented her from performing the job's essential functions. In addition, even though the university was a very large employer and, thus, had considerable flexibility in assigning the plaintiff to some lighter-duty job that she could perform, it did not do so. Instead, it discharged her, and this Court ultimately upheld the validity of that decision against a claim of handicap discrimination. The duty of accommodation, we said, did not require an employer to create a new position for an employee with a disability or transfer her to another position.

Relying on *Coffman,* the defendant in the present case insists that transfer to an open position is categorically excluded from the possible accommodations required by our Human Rights Act. The plaintiff attempts to factually distinguish *Coffman* by contending

the accommodation sought in that case was the creation of a new position, while the plaintiff here sought transfer to an existing job. While that may be true, the defendant is surely correct that the *Coffman* opinion excluded all transfers from the gamut of accommodations an employer might be required to make. *Coffman* stated, in unequivocal terms:

" '[T]he duty to reasonably accommodate only contemplates accommodation of a qualified [handicapped] employee's present position. It does not include a requirement to reassign or transfer an employee to another position.' . . .

" '[R]easonable accommodation' requires only that an employer make reasonable modifications or adjustments designed as attempts to enable a handicapped employee to remain in the position for which he was hired. Where a handicapped employee can no longer perform the essential functions of that position, reasonable accommodation does not require the employer to reassign him to another position in order to provide him with work which he can perform." 182 W.Va. at 77 & 78, 386 S.E.2d at 5 & 6, first paragraph *quoting Carty v. Carlin,* 623 F.Supp. 1181, 1188 (D.Md.1985). (The term "handicapped" inadvertently was omitted in quote of *Carty;* footnote omitted).

Notwithstanding that statement's clarity, we no longer believe it accurately captures the meaning of our Human Rights Act. After *Coffman* was decided, the Legislature amended the Human Rights Act to define disability to bring the law into line with the federal authorities. Subsequently, too, Congress enacted the ADA, which specifically defines "reasonable accommodation" to include "reassignment to a vacant position." ADA, § 101(9)(B), 42 U.S.C. § 12111(9)(B); *see also* 29 C.F.R. § 1630.2(*o*)(2)(ii) (1995). Consequently, the Commission issued new Interpretive Rules Governing Handicap Discrimination, effective May 19, 1994, which

---

15. When an employee requests a reasonable accommodation and the employer has doubt as to the employee's disability, the employer may request documentation from an appropriate professional (*e.g.,* a doctor, rehabilitation counselor, etc.), describing the employee's disability or limitations. Our law does not require an employer to wear blinders at the preaccommodation stage but contemplates an interactive process beneficial to both an employer and employee.

provide: "Reasonable accommodations include, but are not limited to[,] ... reassignment to a vacant position for which the person is able and competent ... to perform[.]" 77 W. Va.C.S.R. 1, § 4.5. Thus, our usual references (federal law [16] and H.R.C. rules) for help in applying the Human Rights Act push us to conclude that reasonable accommodation can include reassignment to a vacant position.

We also believe that the current federal law and the Commission's rules better serve the goals of the disability laws and that *Coffman* was flat out wrong, both on its facts and in its dicta ruling out transfers as a reasonable accommodation. The latter is inconsistent with the common sense courtesy mandated by the Human Rights Act; there is simply no reason that transfer to a vacant position should not be within the range of considerations for accommodating a person with a disability. If an employer has a need to fill a position, and a person with an impairment can meet that need, then reasonable accommodation, if it means anything, ought to require the employer to consider the impaired employee for the position. When a course of action meets the needs of both an employer and employee, then that alternative must be put on the table. As to *Coffman's* application of the duty of reasonable accommodation to its facts, we fully agree with Justice Miller's dissent in the case, which made clear that the employer simply had shuffled job assignments between two employees and that the plan was working without any loss or hardship to the employer. (At least, none was mentioned by either the majority or the dissent.) Under those facts, the employer had no plausible basis for resisting the accommodation.

 We, thus, specifically disavow the following conclusion in the *Coffman* majority opinion:

"While assigning Coffman to the unit position doing only the 'high' work provided her with work that she could perform, it was a position unique to Coffman's circumstances and outside the normally assigned duties of any job classification at the University. Because an employer is not required to create a special job for an employee who cannot do the one for which she was hired, we hold that the appellants were not obligated to retain Coffman in the unit position where she did only the 'high' work." 182 W.Va. at 78, 386 S.E.2d at 6. (Footnote omitted).

The quoted statement merely recharacterized the adjustment of duties as the creation of a new position, thus, presumably relieving the employer of its duty to accommodate. We see no cause for that recharacterization. More importantly, whether an accommodation is labeled as an adjustment to job duties or as the creation of a new position (unique to the plaintiff) is completely irrelevant to determining whether an employer met its duty of accommodation. We cannot begin to draw a meaningful line between what is a simple restructuring of duties and what is the creation of a new job. In some senses, any modification of duties would create a new position unique to the person with a disability. In addition, and most importantly, even if an accommodation could be and is characterized as creating a new position, we do not categorically rule that out as within the possible accommodations that the Human Rights Act might require an employer to make in an appropriate case. Indeed, categorically excluding any strategy from the list of accommodations that can be required of an employer must be highly disfavored. The Human Rights Act dictates that decisions must be made on a case-by-case basis and focus on identifying means that would permit qualified persons with a disability to continue their employment and that would meet an employer's needs without imposing upon it an undue hardship. To the extent that *Coffman* is inconsistent with any of the foregoing, it is expressly overruled.

 By our ruling today, we do not mean to imply that an employer must create a make-work job or retain someone it does not need. What we do mean to imply is that an employer should assess the extent of an employee's disability and how it can be accommodated. If the employee cannot be accommodated in his or her current position,

16. *See e.g., Barefoot, supra; Coffman,* 182 W.Va. at 77, 386 S.E.2d at 5.

however it is restructured, then the employer should inform the worker of potential job opportunities within the company and, if requested, consider transferring him or her to fill the opening. *See Curtis v. Security Bank of Washington,* 69 Wash.App. 12, 847 P.2d 507, 512, *review denied by* 121 Wash.2d 1031, 856 P.2d 383 (1993). Of course, for many employers, especially those with small workforces, there simply may not be any openings of sufficient flexibility to make use of a particular employee. If that is the case, the employer would be justified in releasing the employee. In any instance, the employer must have a reason for refusing a proposed accommodation that would permit the impaired worker's continued employment.

Based on the above, the excluded evidence of the 1991 vacancy for a surface quality coordinator clearly would be admissible under Rule 401 and 402 of the West Virginia Rules of Evidence, and, on the record presented to us, we see no justification for its exclusion under Rule 403 of the West Virginia Rules of Evidence.

■ As the defendant rightly points out, however, the requirements we put in force today were not part of the West Virginia law at the time these employment decisions were made. In addition to *Coffman*'s holding that there was no duty to consider and make available positions other than the one the plaintiff had at the time of his discharge, the Commission's rules that were in effect in 1991 (and that remained in effect until May, 1994) specifically excluded transfer to an open position as a possible accommodation that could be required by the Human Rights Act. Under the circumstances, we are compelled to agree with the defendant that reversal based on a revised interpretation of the reasonable accommodation duty would be inappropriate. To apply our new ruling retroactively in this case would be unfair and would punish the defendant for what may have been an attempt to comply with the law as it existed at the time of the plaintiff's discharge. Therefore, we hold that the ruling in this case will apply prospectively only.

## C.

### *Pretext and Mixed Motive Instructions*

■ To challenge jury instructions successfully, a challenger must first demonstrate the charge as a whole created a substantial and ineradicable doubt about whether the jury was properly guided in its deliberations. Second, even if the jury instructions were erroneous, we will not reverse if we determine, based upon the entire record, that the challenged instruction could not have affected the outcome of the case.[17]

■ There were several objections made to the jury charge. As a general rule, objections to a trial judge's charge must be clear and explicit enough to tell the trial judge what the parties want done to correct the alleged error. Rule 51 of the West Virginia Rules of Civil Procedure states, in relevant part:

> "No party may assign as error the giving or the refusal to give an instruction unless he objects thereto before the arguments to the jury are begun, stating distinctly, as to any given instruction, the matter to which he objects and the grounds of his objection.... Opportunity shall be given to make objection ... out of the hearing of the jury."

If a party complies with Rule 51, then the "harmless error" standard of Rule 61 governs the trial or appellate court's consideration of any request for relief based upon the alleged error. Courts may not grant a new trial, set aside a verdict, or vacate or modify a judgment or order on the basis of any error or defect or anything done or omitted by the trial court "unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." W.Va.R.Civ.P. 61. The recent decisions in *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct.

---

**17.** If a party wishes to complain on appeal of the trial court's refusal to give a proffered instruction, that party must show as a threshold matter that the proposed instruction correctly stated the law.

992, 130 L.Ed.2d 947 (1995), and *State v. Guthrie, supra,* direct reviewing judges to inquire, when determining whether an alleged error is harmless, whether they are in "grave doubt about the likely effect of an error on a jury's verdict," *O'Neal,* 513 U.S. at 435, 115 S.Ct. at 994, 130 L.Ed.2d at 951; if a court does have grave doubt, then the error is harmful. We find as a matter of law that all objections discussed below were properly preserved and the plaintiff will be given the benefit of the more appellant friendly standard of review under Rule 61.[18]

■■■■■■ An intentional discrimination case may be advanced in different ways. A plaintiff can prove discriminatory animus directly or by an inferential method of proof. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973),[19] and *Barefoot, supra.* Numerous opinions of this Court and others have explained the burden-shifting evidentiary regime.[20] "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the 'plaintiff [has] his day in court despite the unavailability of direct evidence.'" *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 622, 83 L.Ed.2d 523, 533 (1985), *quoting Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir.1979).[21] In a claim of intentional discrimination against a qualified individual with a disability, we apply a burden-shifting framework similar to that adopted in *McDonnell Douglas, Barefoot,* and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See Morris,* 189 W.Va. at 317–18, 431 S.E.2d at 357. This method of proof permits a plaintiff to establish his or her prima facie case, which is in essence a rebuttable presumption of discrimination.[22] *See Texas*

18. On the other hand, a party who does not object timely and specifically in accordance with Rule 51 does not have the benefit of review under Rule 61's substantial rights or justice standard, either before the trial court (on a post-trial motion) or on appeal. Unless the reviewing court concludes that the unobjected-to charge caused a miscarriage of justice or undermined the integrity of the judicial process, the charge is treated as having an effect closely analogous to the law-of-the-case doctrine based upon similar reasons of policy and fairness of process.

19. *Receded from by Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

20. *Barefoot, supra; West Va. University/ W. Va. Bd. of Regents v. Decker, supra; Morris Mem. Convalescent Nursing Home, Inc., supra; Kanawha Valley Regional Transp. Auth. v. West Va. Human Rights Comm'n,* 181 W.Va. 675, 383 S.E.2d 857 (1989); *O.J. White Transfer & Storage Co., Inc. v. West Va. Human Rights Comm'n,* 181 W.Va. 519, 383 S.E.2d 323 (1989); *K–Mart Corp. v. West Va. Human Rights Comm'n,* 181 W.Va. 473, 383 S.E.2d 277 (1989); *Heston v. Marion County Parks and Recreation Comm'n,* 181 W.Va. 138, 381 S.E.2d 253 (1989); *Mingo County Equal Opportunity Council v. State Human Rights Comm'n,* 180 W.Va. 240, 376 S.E.2d 134 (1988); *City of Ripley v. West Va. Human Rights Comm'n,* 179 W.Va. 375, 369 S.E.2d 226 (1988); *Fourco Glass Co. v. State of W. Va. Human Rights Comm'n,* 179 W.Va. 291, 367 S.E.2d 760 (1988); *Frank's Shoe Store v. West Va. Human Rights Comm'n,* 179 W.Va. 53, 365 S.E.2d 251 (1986); *Conaway v. Eastern Associated Coal Corp.,* 178 W.Va. 164, 358 S.E.2d 423 (1986); *Montgomery General Hosp. v. West Va. Human Rights Comm'n,* 176 W.Va. 580, 346 S.E.2d 557 (1986);

*Pride, Inc. v. State ex rel. State of W. Va. Human Rights Comm'n,* 176 W.Va. 565, 346 S.E.2d 356 (1986); *State ex rel. State of W. Va. Human Rights Comm'n v. Logan–Mingo Area Mental Health Agency, Inc.,* 174 W.Va. 711, 329 S.E.2d 77 (1985); *Shepherdstown Volunteer Fire Dept. v. State ex rel. State of West Va. Human Rights Comm'n,* 172 W.Va. 627, 309 S.E.2d 342 (1983).

21. "Gone are the days (if, indeed, they ever existed ) when an employer would admit to firing an employee because she is a woman, over forty years of age, disabled or a member of a certain race or religion. To allow those genuinely victimized by discrimination a fair opportunity to prevail, courts will presume that, once the plaintiff has shown the [*McDonnell Douglas* ] elements, unlawful discrimination was the most likely reason for the adverse personnel action." *Geraci v. Moody–Tottrup, Intern., Inc.,* 82 F.3d 578, 581 (3rd Cir.1996).

22. In the context of this case, to establish a prima facie case of disability discrimination, the plaintiff must show that he is a disabled person within the meaning of the law, that he is qualified to perform the essential functions of the job (either with or without reasonable accommodation), and that he has suffered an adverse employment action under circumstances from which an inference of unlawful discrimination arises. *See School Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307, 321 n. 17 (1987); *Morris Mem. Convalescent Nursing Home, Inc., supra; Anderson v. Live Plants, Inc.,* 187 W.Va. 365, 419 S.E.2d 305 (1992); *Teets v. Eastern Associated Coal Corp., Fed. No. 2,* 187 W.Va. 663, 421 S.E.2d 46 (1992). An inference of discrimi-

*Dept. of Community Affairs v. Burdine* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 216 (1981)[23]; *Barefoot*, 193 W.Va. at 487 n. 20, 457 S.E.2d at 164 n. 20. The burden of production then shifts to the employer to come forward with a legitimate, nondiscriminatory reason for its actions. In the unlikely event that the employer at this juncture remains silent, the unrebutted presumption compels the court to enter judgment for the plaintiff. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1091, 67 L.Ed.2d at 216; W.Va.R.Evid. 301. But once the employer meets this burden of production, the presumption raised by the prima facie case is rebutted, and the "inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255, 101 S.Ct. at 1094–95, 67 L.Ed.2d at 216.[24] The *Barefoot/McDonnell Douglas* framework and its attendant burdens and presumption cease to be relevant at that point, and the onus is once again on the employee to prove that the proffered legitimate reason is a mere pretext rather than the true reason for the challenged employment action. *See Hicks*, 509 U.S. at 507–08, 113 S.Ct. at 2747, 125 L.Ed.2d at 416. While *Barefoot/McDonnell Douglas* allows the employee to shift the burden of production to the employer by establishing a prima facie case, at all times the burden of proof or the risk of nonpersuasion on the issue of whether the employer intended to discriminate remains on the plaintiff. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093, 67 L.Ed.2d at 215; *Hicks*, 509 U.S. at 507, 113 S.Ct. at 2747, 125 L.Ed.2d at 416.

To this point, the parties are in agreement. They diverge, however, on the substance of the trial court's use of Defendant's Instruction No. 9, which states:

"By 'pretext' I mean that the reason given for a decision is not the real reason, but is a reason given solely to hide or avoid disclosure of a true reason which is unlawful. The Defendant has stated its reason for discharging the Plaintiff. In order to conclude that reason was a pretext for handicap discrimination, you must first find that the Defendant is intentionally misstating that reason, that the reason given is not the true reason, and that the real reason for the decision was the Plaintiff's handicap.

"It is not enough if you conclude that the reason given by the Defendant was not the true reason. You may find for the Plaintiff only after determining that the reason given by the Defendant was not the true reason and that the Plaintiff has established that the real reason for the Defendant's decision was the Plaintiff's handicap. If you are uncertain as to whether the Plaintiff's handicap was a determining factor, or if you believe that the evidence demonstrates that the Plaintiff's handicap was only one of several possible explanations for the Defendant's discharge of the Plaintiff, and if the Defendant has proven by a preponderance of the evidence that there was a legitimate explanation for the discharge, then you must return a verdict for the Defendant."

The plaintiff makes two exceptions to this instruction. First, he challenges the lines stating: "It is not enough if you conclude that the reason given by the Defendant was not the true reason. You may find for the Plaintiff only after determining that the reason given by the Defendant was not the true reason and that the Plaintiff has established that the real reason for the Defendant's decision was the Plaintiff's handicap." Plaintiff contends that under *Barefoot*, it is enough for the jury to infer discrimination if it concludes the reason given by the defendant was not the true reason.

nation may arise by evidence that a plaintiff was treated less favorably than similarly situated employees who were not in the plaintiff's protected class.

**23.** *Limitation of holding recognized by St. Mary's Honor Center v. Hicks, supra.*

**24.** "Under *Burdine*, satisfaction of the defendant's burden [of production] serves two func-

tions: it deflates the evidentiary presumption of the prima facie case and sharpens the issues for litigation by calling forth all the defendant's arguments for the plaintiff to challenge." Note, *Development in the Law—Employment Discrimination*, 109 Harv. L.Rev. 1579, 1590 (1996) (Part II). For Part I, see Note, *Development in the Law—Employment Discrimination*, 109 Harv. L.Rev. 1568 (1996).

The defendant counters that the instruction was appropriately patterned under existing law. Citing *St. Mary's Honor Center v. Hicks*, the defendant asserts the plaintiff is not entitled to judgment as a matter of law simply because he has shown that the proffered reasons of the employer are pretextual; the plaintiff retains the ultimate burden of persuasion. It is also argued that the jury instruction appropriately followed *Barefoot* and *Hicks* and required the jury to "move beyond merely disbelieving the employer and instead, make a determination based upon a prohibited form of handicap discrimination."

Assuming the plaintiff established a prima facie case under *Barefoot*, the defendant met its burden of production by articulating a legitimate, nondiscriminatory reason for modifying the job description and subsequently terminating the plaintiff: The plaintiff was not performing at the level required for the job. At this point, the issue of whether the plaintiff had established a prima facie case under *Barefoot* became irrelevant.[25] "The presumption [of discrimination], having fulfilled its role of forcing the defendant to come forward with some response, simply drops out of the picture." *Hicks*, 509 U.S. at 511, 113 S.Ct. at 2749, 125 L.Ed.2d at 418. (Citation omitted). To get to the jury, the employee must offer sufficient evidence that the employer's explanation was pretextual to create an issue of fact. If the employer has met its burden of production and the employee offers evidence of pretext, the trier of fact proceeds to decide the ultimate question, *i.e.*, whether the adverse employment action taken against the plaintiff was the result of a forbidden motive.

We agree with parts of both parties' arguments. The plaintiff correctly states that, under *Barefoot*, proof of pretext can by itself sustain a conclusion that the defendant engaged in unlawful discrimination. That is, if the plaintiff has raised an inference of discrimination through his prima facie case and the factfinder disbelieves the defendant's explanation for the adverse action taken against the plaintiff, the factfinder could justifiably conclude that the logical explanation for the action was the forbidden motive. A reasonable person could conclude that if the employer had a legitimate basis for taking the adverse action, then the employer would have presented it at trial, and the employer's failure to present a credible nondiscriminatory reason leaves a discriminatory reason as a logical inference to be drawn.

On the other hand, the defendant is correct in its argument that such an inference does not necessarily follow. As *Hicks* and *Barefoot* make clear, the factfinder might disbelieve the defendant's explanation—that is, conclude that it was pretextual—but still find for the defendant if the evidence, taken as a whole, does not establish a discriminatory motive by a preponderance of the evidence. Although we perceive such cases will be rare, they are theoretically possible, as the *Hicks* facts demonstrate. The trial judge in that case, who sat as the finder of fact, found that the defendant's explanation was pretextual, but was not convinced of the presence of a discriminatory motive. Presumably (the point was not well explained), the judge concluded that the adverse action was brought on by some personal animus, unrelated to race, which the defendant's management was unwilling to admit. Thus, a judge or jury can determine that the employer acted without a good reason and for a reason it has failed (out of embarrassment, poor investigation, or whatever) to articulate, but not for an illicit reason. In such case, the plaintiff loses. That is what Defendant's Instruction No. 9 says, and, to this extent, it is a correct statement of the law.

Although the plaintiff has not challenged the definition of "pretext" offered in the first paragraph of the instruction, inasmuch as the case is being remanded, we believe some comments are appropriate and may promote judicial economy. For the most part, we find the paragraph unobjectionable. As used in the *McDonnell Doug-*

---

**25.** This case has moved well past the issue of the adequacy of a party's prima facie showing under *Barefoot/McDonnell Douglas*. The court's in-struction properly focused on the ultimate issues of sufficiency of proof as to "pretext" and "intentional discrimination."

las/Barefoot formula, pretext means, as the instruction says, that the explanation offered by the defendant was not the reason that actually motivated the action taken against the plaintiff. In proving pretext, it is not sufficient for the employee to show that the employer acted incorrectly or foolishly by firing him (although such evidence would clearly be relevant in proving pretext); rather, the employee must prove that the employer did not act as it did because of its offered explanation. The question for the jury is not whether the employer exercised prudent business judgment but whether the employee has come forward with persuasive evidence to refute that the articulated, legitimate reasons motivated the employer.

We do, however, have some quibbles with the first paragraph. Technically, pretext can be proved without establishing that the defendant is covering up an illicit motive. *See, e.g., Hicks.* (Of course, as explained above, if the pretext is a cover for a legitimate motive, the defendant still wins.) More substantively, we do not agree that the plaintiff must prove that the defendant "is intentionally misstating" its explanation. That requirement overlooks the possibility that subconscious or stereotypical thinking may have motivated the employer to take action against the plaintiff. *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Slack v. Havens,* 7 FEP 885, 1973 WL 339 (S.D.Cal. 1973), *aff'd as modified,* 522 F.2d 1091 (9th Cir.1975). For example, an employer could quite honestly testify that it fired a female employee because of her job performance, yet the plaintiff might still be able to establish "pretext" by proving that the employer subconsciously evaluated women differently.[26]

That brings us to the plaintiff's second objection to Defendant's Instruction No. 9. The plaintiff challenges the language: "[I]f the Defendant has proven by a preponderance of the evidence that there was a legitimate explanation for the discharge, then you must return a verdict for the Defen-

dant." Under the Supreme Court's decision in *Price Waterhouse, supra,* however, if the employee produces ample evidence of discriminatory animus, the employer must show that it would have made the same decision even if there had been no illegal bias. Thus, instructing the jury that it *must* find for the defendant if "there was a legitimate explanation for the discharge" is not only confusing but wrong as a matter of law. The defendant's burden is much higher. "If the finder of fact concludes that the plaintiff has carried [the substantial motivating factor] burden, the burden of persuasion shifts to the defendant to prove that the unlawful motive was not a but-for-cause . . . ." *Wilson v. Susquehanna Township Police Dept.,* 55 F.3d 126, 129 (3rd Cir.1995), *citing Miller v. CIGNA Corp.,* 47 F.3d 586, 594 (3rd Cir.1995) (*en banc* ).

The plaintiff also objects to the second paragraph of Defendant's Instruction No. 9 because he contends it is a mixed motive instruction and this is a disparate treatment case. That argument baffles us; a mixed motive case *is* a disparate treatment case. "Mixed motive" refers to cases in which a discriminatory motive combines with some legitimate motive to produce an adverse action against the plaintiff. "Disparate treatment" refers to cases in which a discriminatory motive produces an adverse employment action against the plaintiff. As a technical matter, then, mixed motive cases form a subcategory of disparate treatment cases.

The confusion on this point, we think, points to a larger problem in this area of the law and that is the extent to which courts (including this one) and litigants often have been so preoccupied by the trees of prima facie case, pretext, shifting burdens, and other labels, that they have not seen the forest of discrimination. We will therefore attempt here to simplify and, it is hoped, thereby bring the forest into focus.

The crux of disparate treatment is, of course, discriminatory motive; the doc-

---

**26.** One could argue that this hypothetical should be assessed as an example of a mixed motive factual pattern, rather than one of pretext. As we explain below, however, we do not find those labels to be helpful or meaningful in this context.

trine aims squarely at intentional acts. The *McDonnell Douglas/Barefoot* regime of prima facie case/explanation/pretext was intended to give plaintiffs easy leverage to force employers to come forward and supply both litigants and courts with a mechanism for arguing and deciding dispositive motions. It was not, however, necessarily designed to facilitate jury analysis. That framework also tends to invite a somewhat oversimplified version of motive, at least as it applies in the employment context. Although there certainly are plenty of cases in which an employer acts solely out of an antipathy against the protected class (which is the model Defendant's Instruction No. 9 depicts), it is also true that in many other cases an employer's motive is a complex amalgam of several different forces. The pervasiveness of subconscious prejudices and stereotypes makes any analysis of that amalgam all the more difficult. Thus, to the extent that the *McDonnell Douglas* analysis operates on the assumption that the employer has acted out of either a purely illegal motive or a purely legal one, it renders itself inapplicable to a large number of employment discrimination cases.

As noted above, the United States Supreme Court took up the matter of mixed motives in *Price Waterhouse v. Hopkins, supra,* and concluded that when a plaintiff proves that a discriminatory motive entered into an employment decision, the burden of persuasion then shifts to the defendant to show that the same decision would have been made in the absence of the discriminatory motive. 490 U.S. at 231–58, 109 S.Ct. at 1780–95, 104 L.Ed.2d at 276–93. (Plurality opinion). Concurring opinions by Justices White and O'Connor said that the burden should shift if the plaintiff has shown that the unlawful motive was a substantial factor in the decision. 490 U.S. at 258–61, 109 S.Ct. at 1795–96, 104 L.Ed.2d at 293–95 (White, J., concurring in the judgment) and 490 U.S. at 261–79, 109 S.Ct. at 1796–1806, 104 L.Ed.2d at 295–306 (O'Connor, J., concurring in the judgment). Justice O'Connor added a further gloss that the showing must be made by direct evidence, a gloss that several circuits

have adopted, although not uniformly.[27] Subsequently, Congress amended Title VII in the Civil Rights Act of 1991 and modified the mixed motive analysis to provide that an unlawful practice is established if a plaintiff proves by a preponderance that a discriminatory intent "was a motivating factor" in an employment decision. Title VII of the Civil Rights Act of 1964, § 703(m), 42 U.S.C. § 2000e—2(m) (1994). As a matter of remedy, the amended Act states that a defendant can avoid an assessment of damages and certain injunctive relief by bearing the burden of persuasion in proving that the same action would have taken place "in the absence of the impermissible motivating factor." *Id.* § 706(g)(2)(B), 42 U.S.C. § 2000e—5(g)(2)(B). Following that congressional action, the Supreme Court, speaking through Justice O'Connor, stated in *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338, 347 (1993) (ADEA), that "a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome." Notably absent from this standard is any reference to the "substantial factor" test or the circumstantial-direct evidence distinction. Rather, the "played a role" language connotes the same effect as Section 703(m)'s "motivating factor" standard. *See* Michael J. Zimmer, *The Emerging Uniform Structure of Disparate Treatment Discrimination Litigation,* 30 Ga. L.Rev. 563, 586–88 (1996).

These developments offer a synthesis for disparate treatment analysis. *Id.* (*passim*). We believe that the purposes of the Human Rights Act would be best served by adopting that federal standard, as set forth in the 1991 Civil Rights Act. Thus, a plaintiff states a claim under the Act if he or she proves by a preponderance of the evidence that a forbidden intent was a motivating factor in an employment action. Liability will then be imposed on a defendant unless it proves by a preponderance of the evidence that the same result would have occurred even in the absence of the unlawful motive.

**27.** The substantial split among federal circuit courts is thoroughly developed in a recent law review article. *See* Michael J. Zimmer, *The*

*Emerging Uniform Structure of Disparate Treatment Discrimination Litigation,* 30 Ga. L.Rev. 563, 589 n. 97 (1996).

We believe this shift of the risk of nonpersuasion is appropriate. First, in a case where the plaintiff proves that the defendant harbored an unlawful motive, it is only fair that the defendant bear the burden of persuasion in sorting through the difficult issue of causation when the evidence shows there have been multiple contributing factors. In so doing, we merely adopt the well-established approach used in other contexts.[28] Our motivating factor standard specifically rejects any requirement that some additional threshold, such as the substantial factor test, must be met before the burden shifts. Even if we could describe (and we cannot) what a substantial factor means in this context, we would reject it as unwarranted. If the evidence shows that discriminatory motive entered into the decision making to any degree, then the employer engaged in wrongdoing and should bear the burden on causation. Moreover, and generally speaking, the less that discriminatory intent was a factor, the easier it is for the defendant to meet its burden.[29]

We also emphatically reject the position that the burden shifts only when the plaintiff has established illicit motive through direct evidence, and we do so for several reasons. First, whether the plaintiff's proof is by direct or circumstantial evidence, or both, has nothing to do with the strength of her case; rather, the plaintiff's ability to produce direct evidence is completely accidental. Second, neither form of proof is necessarily more reliable than the other. Circumstantial evidence can be powerful, and direct evidence limp, and vice versa. Third, the direct-circumstantial distinction overlooks what the jury's role is in disparate treatment cases. Essentially, the jury is charged with the duty of recreating what in fact happened and whether the facts that did happen included intentional discrimination. *See State v. Houston,* 197 W.Va. 215, 234, 475 S.E.2d 307, 326 (1996) ("[i]n the ... category of merit related issues, the jury in close cases effectively decides not only what happened but also whether what happened deserves the legal label described in the jury instructions"). (Cleckley, J., concurring). Thus, if the jury reads the facts and concludes that the employee has proved that a discriminatory motive entered into the employer's decision, it should not matter whether that conclusion was induced by direct or circumstantial evidence. Fourth, we are not convinced that the direct-circumstantial distinction is a viable or meaningful one. Obviously, several of the federal circuits have had a great deal of difficulty with it, and there are substantial authorities who conclude that there is no such thing as direct evidence "that involves neither a logical nor an inferential process." 1A John H. Wigmore, *Evidence In Trials At Common Law* § 26 at 959–60 (Peter Tillers ed.1983) (quoted in Zimmer, *supra,* at 614).[30]

**28.** When, for example, a tort plaintiff proves that a defendant acted negligently and that the negligence proximately contributed to the plaintiff's injury, the defendant must bear the burden of persuasion on the affirmative defenses of superseding cause and comparative negligence (both of which go to causation). *E.g.,* Syl. pt. 2, *Addair v. Bryant,* 168 W.Va. 306, 284 S.E.2d 374 (1981) (burden of proof shifts to defendant on issue of contributory negligence). Similarly, when civil rights plaintiffs prove that an official action taken against them was based at least in part on their exercise of a constitutional right, the burden on the but-for causation shifts to the defendant. *E.g., Mt. Healthy City Sch. Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), *superseded by statute as stated in Rivera v. U.S.,* 924 F.2d 948 (1991); *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593, *cert. denied,* 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984).

**29.** A simple fact pattern illustrates the point and also the appropriateness of not adopting a substantial factor rule. Suppose that a nine-member board votes 8–1 to discharge a black employee, who then sues and proves that one board member—and only one—voted to discharge purely out of racial hatred. In such a case, the defendant would ordinarily have little difficulty meeting its burden and proving that the same result would have occurred in the absence of the one member's prejudice. But suppose the vote was 5–4 to discharge and the evidence on motive was the same. In that case, motive was no more of a "substantial factor" than in the first, but it clearly might have made a difference. We see no reason why the defendant should bear the risk of nonpersuasion in some cases but not in that one.

**30.** *See also Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994) (because "intent to discriminate is a mental state and mind reading [is] not an acceptable tool of judicial inquiry, it

■ To be clear, the plaintiff can create a triable issue of discrimination animus through direct or circumstantial evidence.[31] Thus, a plaintiff who can offer sufficient circumstantial evidence on intentional discrimination should prevail, just as in any other civil case where the plaintiff meets his burden. The question should not be whether the evidence was circumstantial or direct, but whether it was strong enough to shift the burden of persuasion to the defendant. *See Conaway v. Eastern Associated Coal Corp.*, 178 W.Va. 164, 358 S.E.2d 423 (1986). While we recognize that most of the federal opinions have made direct evidence in its traditional sense, *i.e.*, evidence that can prove the existence of a fact without inference or presumption, a prerequisite to shift the burden of persuasion, these cases have offered little justification for such a limitation. *See Nichols v. Loral Vought Systems Corp.*, 81 F.3d 38, 40 (5th Cir.1996). To the extent they have, we find the criticisms we outlined above to be more convincing. If a criminal defendant can be proven guilty beyond a reasonable doubt based wholly on circumstantial evidence, it is incongruous to suggest that circumstantial evidence, if sufficient to prove a specific path between an improper motive and the challenged decision, cannot meet the threshold of mixed-motive cases.

■ We turn now to the task facing a court at the conclusion of a jury trial. Assuming there is a defense motion for a directed verdict, the trial court should determine whether the plaintiff has adduced evidence sufficient to allow a reasonable jury to conclude that the defendant intentionally discriminated against the plaintiff on the basis of a prohibited ground that has been alleged by the plaintiff. If the plaintiff has submitted credible evidence of the *McDonnell Douglas/Barefoot* prima facie case and enough evidence of pretext to create a question of fact, then the case should go to the jury. Pretext can be shown through either circumstantial or direct evidence (whatever that means). In instructing the jury, the trial court should bear in mind that the jury's role is the recreation of what happened and should strive to charge it in ways that are meaningful and lucid. We prefer in disparate treatment cases that the charge inform the jurors that the plaintiff bears the burden of proving by a preponderance of the evidence that the alleged forbidden bias was a motivating factor in the defendant's decision to take an adverse action against the plaintiff. If the plaintiff has carried that burden, then the jury should find for the plaintiff unless the defendant can prove by a preponderance of the evidence that it would have taken the same action in the absence of the impermissible motive.[32] In making its deter-

---

may be the only true direct evidence of intent that will ever be available").

**31.** Our ruling regarding circumstantial evidence is consistent with other areas of our civil litigation law. For example, "deliberate intention" cases under W. Va.Code, 23–4–2(c)(2)(iii)(B) (1991), this Court has stated that "subjective realization" can be shown through circumstantial evidence. *See Bell v. Vecellio & Grogan, Inc.*, 191 W.Va. 577, 447 S.E.2d 269 (1994); *Blevins v. Beckley Magnetite, Inc.*, 185 W.Va. 633, 408 S.E.2d 385 (1991); *Mayles v. Shoney's*, 185 W.Va. 88, 405 S.E.2d 15 (1990). Similarly, the United States Supreme Court has stressed recently the importance of circumstantial evidence in proving a race-based motive in the congressional redistricting cases: "The plaintiff bears the burden of proving the race-based motive and may do so either through 'circumstantial evidence of a district's shape and demographics' or through 'more direct evidence going to legislative purpose.'" *Shaw v. Hunt*, — U.S. —, —, 116 S.Ct. 1894, 1900, 135 L.Ed.2d 207, 218–19 (1996), *quoting Miller v. Johnson*, 515 U.S. 900,

—, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762, 779 (1995).

**32.** Because of differences in the language between the Human Rights Act and Title VII, there is a substantial question whether a West Virginia plaintiff is entitled to any relief, including injunctive relief and attorney's fees, merely by showing that a forbidden ground was a motivating factor. It could be argued that the plaintiff can prevail only if the jury also concludes that the discriminatory intent was determinative. As stated earlier in the text, Section 703(m) expressly states that an unlawful employment practice is established when the plaintiff proves that an impermissible basis was a motivating factor, and Section 706(g)(2)(B) makes the defendant's rebuttal a matter of determining the appropriate remedy. 42 U.S.C. §§ 2000e—2(m) & —5(g)(2)(B). On the other hand, Section 5–11–3(h) provides that " 'discriminate' or 'discrimination' means to exclude from, or fail or refuse to extend to, a person equal opportunities because of race, religion, color, national origin, ancestry, sex, age, blindness, handicap or familial status and in-

mination on both intent and causation, the jury should take into account any inferences created by the plaintiff's membership in the protected class, his or her qualifications, the defendant's explanation, the believability of that explanation, and all other evidence bearing on the issues. *Miller v. CIGNA Corp.*, 47 F.3d at 605 (Greenberg, J., concurring in part and concurring in judgment); *Zimmer, supra,* at 621. We believe this approach aligns us with the analysis required under the amended Title VII and best serves the purposes of the Human Rights Act.

■ In this case, Defendant's Instruction No. 9 was defective because it told the jury, "if you believe that the evidence demonstrates that the Plaintiff's handicap was only one of several possible explanations for the

cludes to separate or segregate[.]'' Given these definitional differences, on this narrow point, it might be reasonable to interpret that our Act requires a different result from the federal law. We leave this issue unresolved for another day.

**33.** The plaintiff complains that two other instructions were also defective. They are:

*"Defendant's Instruction # 7*

"Because the Plaintiff bears the burden of proof in this case, you must enter a verdict for the Defendant unless you find that the Plaintiff has proved that the Defendant intentionally discriminated against him on the basis of handicap. As jurors, you may not presume that the Defendant intended to discriminate against the Plaintiff, nor may you base a finding of intentional discrimination solely upon the Plaintiff's subjective belief that he was discriminated against by the Defendant. Moreover, mere suspicions that the Defendant's actions were based on handicap discrimination are not enough and cannot be the basis for finding for the Plaintiff. Proof of discriminatory motive is crucial. The Plaintiff must prove by a preponderance of the evidence not only an adverse action by the Defendant, but a deliberate and specific intent by the Defendant to engage in handicap discrimination as well."
*"Defendant's Instruction # 10*

"In determining whether the reason given by the Defendant for its decision was, in fact, a pretext for intentional discrimination, you are instructed that the Defendant's reason cannot be considered a pretext so long as the personnel who made the decision had an honest belief that the facts upon which they based the decision were true. Neither the Plaintiff's perception of his own abilities nor his subjective belief that he was discriminated against is im-

Defendant's discharge of the Plaintiff, and if the Defendant has proven by a preponderance of the evidence that there was a legitimate explanation for the discharge, then you must find for the Defendant." That instruction did not inform the jury, as it should have, that the defendant had to prove that the same result would have occurred in the absence of discrimination. Moreover, it left open the possibility that the defendant's proof of a legitimate explanation could allow it to prevail even if the explanation had no effect on the defendant's decisionmaking. Such post hoc rationalization is clearly inconsistent with our precedents and the reasoning above. Because the flawed instruction went to the heart of the case, we find the error to be prejudicial, thus requiring a new trial.[33]

portant for your determination. You are also not to decide this issue on the basis of whether you agree or disagree with the Defendant's decision to discharge Plaintiff, so long as that decision was not based on handicap discrimination. You and I are not in a position to tell the Defendant how to run its company, or which employees to discharge, so long as unlawful discrimination is not involved. Any employer, such as the Defendant, is entitled to make its own business judgments, regardless of what others might think of those judgments. Stated another way, the law provides that an employer has the right to make employment decisions for good reasons, bad reasons, or no reason at all, absent discrimination. Your focus must be on the employer's motivation and not on its business judgment. Therefore, if you conclude that the Defendant's personnel honestly believed that the facts upon which they based their decision were true, you must return a verdict in favor of the Defendant."
We do not find these instructions to be deficient enough to warrant a new trial. Indeed, with one exception, we find them to be consistent with our discussion above. The exception is that we believe the last sentence in Defendant's Instruction No. 7 should be deleted. Although it could be argued that the sentence correctly states the law, we have made clear in the text that a plaintiff can establish a disparate treatment case if he or she proves that the defendant acted on the basis of some subconscious motive or stereotype about the plaintiff's class. *See, e.g., Price Waterhouse v. Hopkins, supra; Slack v. Havens, supra.* We are not certain that the motive in that kind of a case could be characterized as "a deliberate and specific intent by the Defendant to engage in . . . discrimination." To avoid confusion, discretion would dictate deleting the sentence.

Defendant's Instruction No. 10, commonly called a "business judgment" instruction, which

## III.

## CONCLUSION

It is important that litigants and lower courts do not read too much into today's ruling. To be sure, our discrimination laws are not a form of job assurance for handicapped individuals or any other protected class members. Employers retain the right to restructure jobs and exercise business judgment, including even bad judgment. Employees can be let go for any reason or for no reason, provided that the reason is not a prohibited one. *See Guyan Valley Hosp. v. West Va. Human Rights Comm'n,* 181 W.Va. 251, 382 S.E.2d 88 (1989), *overruled on other grounds by West Va. Univ./W. Va. Bd. of Regents v. Decker, supra* (" '[i]llegal discrimination' means treating individuals differently because of some individual trait that the law says can't legitimately be considered. Examples of such traits are race, age, sex and handicap"). Accommodation regards efforts that address an individual's ability to perform a job, not his or her entitlement to it.

By prohibiting discrimination against individuals with disabilities, W. Va. Code, 5–11–9, forces employers to make a reasonable assessment whether an employee with known disabilities can perform the essential functions of the job with or without reasonable accommodation. Through this statute and its requirement of reasonable accommodation, the Legislature acknowledges that disabilities may prevent individuals from performing a given job the same way and in the same manner as nondisabled employees. Nevertheless, this laudable legislation embraces the value judgment that the benefits of employing and retaining persons with disabilities often outweigh the cost of accommodating and, unless a proposed accommodation is unreasonable or is inadequate to allow the employee with a disability to perform the essential functions of the job, the employer must bear the burden of providing the accommodation.

The judgment against the plaintiff is vacated, and a new trial is ordered. The parties will bear their own costs. On remand, the circuit court may deliver instructions consistent with the rulings in this case.

Reversed and remanded with directions.

McHUGH, C.J., concurs.

---

in essence told the jury that the defendant had the right to make employment decisions for any reasons except discriminatory ones, is a correct statement of the law. Courts simply have no business telling employers how to make personnel decisions. *See Walker v. At & T Technologies,* 995 F.2d 846, 849 (8th Cir.1993) (in an employment discrimination case, a business judgment instruction is crucial to a fair trial). Our prior cases have stated that when a proper and correct proposed instruction addresses an issue that is crucial to a fair presentation of the case, the trial court must give the instruction. Of course, a defendant is not entitled to demand that the business instruction include specific language.

The form and language of jury instructions are committed to the sound discretion of the trial court. We would hope, however, that the trial court would use that discretion to avoid repetitious statements of the law that could create an unintended advantage for one side or the other. This is especially true when the inferences to be drawn from the overall evidence are conflicting and could lead to different results. As Justice Frankfurter urged years ago, juries are not "too stupid to see the drift of the evidence." *United States v. Johnson,* 319 U.S. 503, 519, 63 S.Ct. 1233, 1241, 87 L.Ed. 1546, 1558 (1943). Defendant's Instruction No. 10 might be an appropriate object for such editing.